**HAZELTINE RESEARCH, Inc., Plaintiff-Appellee,**

v.

**AVCO MANUFACTURING CORPORATION and The Harry Alter Co., Inc., Defendants-Appellants.**

**No. 11327.**

United States Court of Appeals
Seventh Circuit.

Oct. 31, 1955.

Rehearing Denied Dec. 1, 1955.

138

ants-appellants, Warren G. Sullivan, Don A. Banta, Chicago, Ill., Morris Relson, New York City, of counsel.

Laurence B. Dodds, Little Neck, N. Y., M. Hudson Rathburn, Chicago, Ill., for appellee, Philip F. LaFollette, Leonard A. Watson, New York City, Mason, Kolehmainen, Rathburn & Wyss, Chicago, Ill., of counsel.

Before FINNEGAN, LINDLEY and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Plaintiff brought an action for patent infringement in the district court against Avco Manufacturing Corporation[1] and its Chicago area distributor, The Harry Alter Co., Inc. The patent in suit was directed to a synchronization system for television, and is known as Toulon reissue patent, No. 22,055. Avco counterclaimed asking a declaratory judgment of invalidity, noninfringement and unenforceability of said patent, and for damages.

The district court entered a consent order of noninfringement as to claims 1 to 4 inclusive, which were included in the original patent and repeated without change in the reissue, and as to claims 8, 11 and 12, added by reissue. The district court, 126 F.Supp. 595, made findings of fact and conclusions of law, held reissue claims 5, 6, 7, 9, 10 and 13 to be valid and infringed, entered a judgment which enjoined further infringement, awarded damages and costs to plaintiff and dismissed Avco's counterclaims. From that judgment Avco took this appeal.

The original Toulon patent[2] was issued on an application filed July 3, 1937. This invention comprises a basically new type of synchronizing system for electronic television receivers. It relates to a type of synchronization, generally known as "automatic frequency control." Such control is a corrective method used

Francis J. Naphin, Chicago, Ill., Floyd H. Crews, New York City, Charles M. Hogan, Alden D. Redfield, Cincinnati, Ohio, Pruitt & Grealis, Chicago, Ill., Darby & Darby, New York City, for defend-

1. For convenience, referred to herein as "Avco."

2. 2,227,815.

in conjunction with a controlling source, for maintaining the proper speed or frequency of operation of a controlled device.

In 1938, Toulon submitted his application to plaintiff and others for purchase. They rejected it. Thereafter, on February 5, 1940, one of plaintiff's engineers, Loughren, devised an automatic frequency control system. In July 1940 plaintiff reopened negotiations with Toulon's United States agents, for the purpose of purchasing the Toulon application, which at that time had been allowed [3] with four claims, but the patent had not been issued because of failure to pay the final statutory fee. On September 12, 1940, plaintiff purchased the Toulon application from his agent Langley, under an agreement that plaintiff had the right, at its own expense, to further prosecute said application. Langley knew that plaintiff intended to seek a reissue of the patent which was then expected to result from Toulon's application. An assignment of the original patent to plaintiff, an application for a reissue thereof and a reissue oath were sent to Toulon through Polydoroff, his agent. They were signed by Toulon and returned to plaintiff's attorneys. The final fee was paid and accepted by the patent office.

The reissue application was filed April 23, 1941 and the reissue patent (Re. 22,055) which is involved in this action, was issued thereon on March 24, 1942. The reissue patent claims, according to plaintiff, are simply more accurate and more complete definitions of Toulon's invention; they are in some respects broader and in some respects narrower than the original claims. Defendants contend that the reissue claims are not for the same invention as the original patent.

The contested issues, stated affirmatively by defendants, are: The claims in issue are invalid, the reissue patent is unenforceable, the claims in issue are not infringed, and plaintiff has violated the anti-trust laws by block-booking its patent.

1. The first reason advanced by Avco to sustain its contention that the reissue claims in issue are invalid, is that they were granted through "factual technical error." This court's attention is directed to proceedings said to have occurred in the patent office which resulted in the allowance of claims 5 to 12 inclusive, after they had been rejected by an examiner, and the adding of claim 13. The amendment to each of claims 5 to 12 inclusive was made by inserting the phrase:

"in the absence of a frequency-correcting control voltage applied thereto."

Avco cites certain evidence in the record which it says shows that this amendment made the claims factually incorrect.

We agree with plaintiff that this contention is not properly before us for determination. Avco's answer and counterclaim make no specific reference thereto, nor is there anything in the record to indicate that this issue was presented to the district court. While Avco in its reply brief states that the issue was covered in its proposed findings of fact and conclusions of law, no submitted finding or conclusion specifying that issue has been included in the record before us. Avco in its brief states that the district judge made no specific findings on this issue. We are not surprised at that statement in view of the total failure of the record before us to show that that issue was ever raised in that court. Therefore, we cannot consider it here.

2. A principal question in this case is whether the reissue patent is for the same invention as that covered by the original patent. Avco contends that the reissue patent is invalid because, *inter alia,* it is not for the same invention.

The evidence indicates that what is known as synchronization is a troublesome feature of a satisfactory television system. By synchronization is meant the method to keep the scanning of the image

**3.** on November 21, 1939.

at the transmitter and the scanning of the picture tube at the receiver in step or in gear. This synchronization is effected by sending out a very short electrical synchronizing pulse (sync pulse) [4] at the end of each series of lines, called a field. At the receiver, these synchronizing pulses are separated from the image signals and utilized to control generators of scanning waves which cause the cathode-ray beam to scan the face of the picture tube. If the scanning at the receiver loses synchronization, that is, gets out of gear with the transmitter, the lines of the reproduced image may begin at various points across the tube face and the image becomes distorted.

The background against which Toulon conceived his original patent [5], issued by the United States Patent Office on January 7, 1941, on his application filed on July 3, 1937, is revealed by the evidence in this record. The earliest work on television systems, in the 1920's, was directed to complex mechanical devices which, while operative, were never developed to a commercially practical form. The synchronization of such systems was quite different in character because of the high inertia of the mechanical moving parts, which also made them inherently relatively immune to noise interference. The next stage in the development of the art was that including the all-electronic receiver which reached commercial form in England in 1937 and in the United States in 1940. Such receivers were of the "triggered" type, that is, of the type in which a horizontal sync pulse at the end of each line triggered the receiver scanning oscillator to initiate the succeeding scanning line and in which the vertical synchronizing system was of a similar type. During the period up to 1940, those working in the television field were entirely satisfied with this triggered type of synchronization, particularly because of the extreme accuracy of synchronization under good signal conditions. They did not appreciate the fact that disturbing electrical noise pulses are frequently of the same character as the sync pulses and that, in a triggered synchronizing system, such noise pulses may either themselves trigger the receiver scanning oscillator to initiate successive lines at improper times or may cancel out certain sync pulses, both resulting in failure of the synchronizing system so that the picture becomes an unintelligible jumble. It was not realized at that time that the effect of such electrical noise interference would produce "tearing" of the picture.

In this state of the art, in 1936, Toulon made the invention of the patent 2,227,-815 in France and filed his original French application therefor. The district court, in its finding No. 3, found:

> "3. Toulon, a noted French inventor, made the invention of the patent in suit in France, in 1936. The Toulon invention comprises a basically new type of synchronizing system for electronic television receivers. It involves four essential factors: (1) a recognition of the problem, that is, the inadequacy of the triggered synchronizing system under unfavorable noise conditions; (2) a recognition of the fact that one of the known 'building blocks' of the electronics art, the phase comparator, had the characteristic of substantial immunity to noise pulses of the same character as the short-duration synchronizing pulses; (3) a modification of the known phase comparator building block, enabling it to work with the particular wave forms found in electronic television receivers; and (4) association with this special phase comparator of a number of other building blocks, individually known but specially selected, to construct a new synchronizing system operating on essentially new principles and achieving essentially new results." [6]

---

4. "Sync" is abbreviation for synchronizing. "Pulse" means signal.

5. 2,227,815.

6. The court in finding No. 8 found:
 "8. In brief, what Toulon disclosed in

The original Toulon patent describes his invention as one which "relates to a new process to assure the synchronism of a relaxation oscillatory system by means of electric signals coming from an outside station. It concerns more particularly the synchronization of television receiving stations comprising a relaxation device controlled by the synchronization signals coming from a transmitting station."

The patent proceeds to set forth:

"*One of the most important applications* [7] of the invention is that of assuring the synchronism between a transmitting station and the electronic beam of a Braun tube at the receiving station.

"Present-day Braun tube receivers generally comprise two beam deflecting devices, each consisting of a condenser which is charged progressively, and a relay of the extreme vacuum or gas type through which the condenser suddenly discharges when this relay receives the synchronization signals coming from the transmitting station. This system has the drawback that if one of the signals fails or if a parasitic impulse releases the relay out of time, then the image becomes defective."

The patent sets forth that Toulon's invention

"is based on an entirely different process which consists in realizing locally a relaxation device having a frequency very near that of the frequency of the lines or of the images of the transmitting station, and which is completely controlled and compelled to remain in coincidence with that of the transmitting station, by the continuous measurement of the difference in phase between these two frequencies. Contrary to what has been done up to the present time, the signal received is not used to release the local relaxation device, but the latter operates independently of the transmission of the synchronization signals and its frequency is controlled by a device which automatically compensates for the lag between the synchronization signals and the oscillations of the relaxation device."

At the trial in the district court there was testimony of Alan Hazeltine, who qualified as an expert witness in television matters, that the language just quoted is, in his opinion, an outline of the said invention. He further testified that the disclosure of the specification as a whole is adequate to enable one skilled in the art to practice the invention there outlined.

The original patent proceeds to set forth that

his original Patent 2,227,815 as his invention and sought to patent and what is described and claimed in his Patent Re. 22,055, comprises *(sic)* the following essential features:

" '(a)—a system for precisely controlling the synchronization of an electronic television receiver from a series of received synchronizing pulses of short duration relative to their period,

" '(b)—for substantially eliminating the deleterious effects of noise pulses similar in nature to the synchronizing pulses and the effects of momentary synchronizing signal interruption, comprising,

" '(c)—a circuit for supplying the periodic synchronizing signal pulses to the system,

" '(d)—a relaxation oscillator which in the absence of control has substantially the same average frequency as these synchronizing signal pulses,

" '(e)—a phase-comparison circuit for deriving a periodic wave dependent in wave form upon the phase difference between the synchronizing-signal pulses and the output wave of the oscillator,

" '(f)—a rectifier for developing from this derived periodic wave a unidirectional frequency-correcting control voltage,

" '(g)—specifically in association with a circuit of long time constant relative to the period of the signal pulses,

" '(h)—a circuit for utilizing this unidirectional control voltage to control the instantaneous frequency, and thus the phase, of the relaxation oscillator,

" '(i)—and a circuit for developing from the out-put of the relaxation oscillator a saw-tooth wave for scanning.' "

7. Italics supplied.

"In accordance with the invention, the very short synchronization impulses are transformed into signals the shape of which resembles that of the oscillations of the local relaxation device, and the difference in phase between the two currents of the same form is measured. The result of this measure is most frequently that of causing a drop in voltage across a resistance which is a function of the lag, and this variation in voltage is utilized in order to correct the frequency of the local relaxation device. The arrival of a parasitic impulse or the absence of the synchronization signal has practically no effect on the quality of the image, because the variation in the drop of voltage resulting therefrom in the resistance is too small to modify in an appreciable manner the cycle of the relaxation device; in other words, the framing of the image suffers practically no modification."

Referring to a drawing attached to the patent, consisting of figures 1, 2 and 3, the patent states:

"The invention will be better understood by reference to the drawing, which illustrates *by way of example a special manner of execution* [8] of complete control of the frequency of a 'Thyratron' relaxation device which feeds a Braun tube by means of the synchronization pulses of a standard Hertzian wave television transmitting station and in which:

"Figs. 1 and 2 represent, as a function of time, the form of the currents in the different parts of the assembly; and

"Fig. 3 shows the basic diagram of a synchronizing system in accordance with the invention."

This is followed by a detailed explanation in the course of which the following language [9] appears:

"*If* the relaxation device consists of a gas-filled tube such as a 'Thyratron' associated with a fixed condenser and a resistance, the relaxation frequency may be varied within rather wide limits by changing the value of the polarization of the 'Thyratron' grid. As this polarization increases, the frequency of the oscillations decreases. * * *

"Fig. 3 shows the details of *a special assembly* utilizing the proposed control system in the particular case in which a 'Thyratron' is used in the relaxation device. * * * The advantage of this device over former systems lies in the fact that the synchronization signals may be absent either on account of fading or on account of parasitic disturbances or else additional disturbing signals may enter, without causing the local relaxation device, however, to cease to operate and consequently without causing the sweeping or scanning of the lines or images of the Braun tube 22 to cease to exist."

Four claims of the inventor are embodied in the original patent.[10]

8. Italics supplied.

9. Italics supplied.

10. "1. In a television system, a receiver including a relaxation device having a saw-tooth output waveform, a source of synchronizing signals external to said receiver, means for transforming said synchronizing signals to have a waveform substantially the same as the output waveform of said relaxation device, and means for varying the frequency of said relaxation device in accordance with the phase difference between the output of said relaxation device and said transformed synchronizing signals.

"2. In a television system, a relaxation device having a saw-tooth output waveform and including a gas-filled tube having a grid, a source of synchronizing signals, means for transforming said synchronizing signals to have a waveform substantially the same as the output waveform of said relaxation device, means for producing a direct-current voltage the amplitude of which is a function of the phase difference between the output of said relaxation device and said trans-

It is contended by plaintiff, and supported by evidence in the record, that the Toulon reissue patent, involved in this suit [11] is "directed to a basically new system for effecting this synchronization between a transmitter and an all-electronic television receiver and particularly to such a system which is relatively immune to the disturbing effects of noise interference and, even in the presence of such noise, gives a relatively stable and acceptable picture," and that "the invention here in suit represents a rather basic and fundamental advance in the television art."

Toulon's original application and the patent issued thereon show that he did not conceive his invention as being restricted to an apparatus including an instrumentality for transforming the wave form of either the synchronizing pulses or the locally generated pulses, such apparatus being included in the original patent merely by way of example and illustrative application. Furthermore, the evidence in the record shows that, through error and without any deceptive intention, the patent issued thereon was partly inoperative by reason of Toulon's claiming less than he had a right to claim.

The record contains a stipulation by counsel for both parties that, with two exceptions, changes occurring in the outline contained in the reissue patent do not constitute new matter. The two exceptions are covered by the testimony of Professor Hazeltine that the insertion of the word "instantaneous" following the words "local relaxation device" and the word "momentarily" preceding the words "controlled by a device" is not the introduction of any new idea or disclosure. He testified as to the reissue patent also, that the outline of the invention therein set forth, together with the disclosure of the specification as a whole, is adequate to enable one skilled in the art to practice the invention there outlined. The evidence shows that the changes made in the reissue patent were solely by way of clarification, alternative expression, amplification, expression of a more general aspect of the invention, or correction of unclear or erroneous language, and that they did not involve any new idea or disclosure, and further that each of the elements of the invention referred to in the reissue claims is in fact disclosed in the original Toulon patent. This fully satisfies the requirement of the reissue statute of 1952.[12]

---

formed synchronizing signals, and means for applying said direct-current voltage to said grid.

"3. In a television system, a receiver including a relaxation device having a saw-tooth output waveform, a source of synchronizing signals external to said receiver, means for transforming said synchronizing signals to have a waveform substantially the same as the output waveform of said relaxation device, means for producing a potential which is a function of the phase difference between the output of said relaxation device and said transformer synchronizing signals, and means for utilizing said potential to vary the frequency of said relaxation device.

"4. In a television system, a relaxation device having a saw-tooth output waveform, a source of synchronizing signals, means for transforming said synchronizing signals to have a waveform substantially the same as the output waveform of said relaxation device, means for producing a direct-current voltage the amplitude of which is a function of the phase difference between the output of said relaxation device and said transformed synchronizing signals, and means for utilizing said direct-current voltage to vary the frequency of said relaxation device."

11. Re. 22,055.

12. 35 U.S.C.A. § 251. "Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired

■ The 1952 statute, rather than the prior law [13], governs this case because we are here considering an unexpired patent which is covered by section 4(a) of the 1952 enactment [14], which provides:

" 'This Act shall take effect on January 1, 1953 and * * *. It shall apply to unexpired patents granted prior to such date except as otherwise provided.' " See, to the same effect, Lyon v. Bausch & Lomb Optical Co., 2 Cir., 1955, 224 F.2d 530 and Pacific Contact Laboratories v. Solex Laboratories, 9 Cir., 1953, 209 F.2d 529.

We hold that the invention covered by the original patent and that covered by the reissue patent are one and the same.

We do not believe that U. S. Industrial Chemicals, Inc., v. Carbide & Carbon Chemicals Corp., 1942, 315 U.S. 668, 62 S.Ct. 839, 86 L.Ed. 1105, relied on by Avco, is inconsistent with our conclusion. In that case a process described in the original patent included a step in which water was used. In a reissue patent the use of water was made permissive. The court pointed out that the process described in the original patent included a step not designated as optional or desirable but described and claimed as an integral part of the whole operation, while, in contrast, the reissue treated this step as immaterial and mentioned the introduction of water as for the mere purpose of controlling the temperature in the reaction zone. The court concluded that the reissue omitted a step in the process which was described and claimed as essential in the original patent, holding that the reissue was not for the same invention described, claimed and intended to be secured by the original patent, and was, therefore, void.

■ 3. Toulon's invention, (the outline of which was embodied in the original patent specifications and interpreted by Alan Hazeltine, an expert witness) included the subsequent Loughren suggestion. It was not limited to use with a "sync transforming means," reference to which in the original Toulon patent was made only as an example of one use of that patent. In accepting the original patent with only the four claims allowed, Toulon's attorney, Albert R. Hodges, erred. There is no evidence indicating that either Toulon or Hodges at any time had any intention to deceive. Deceptive intention, like fraud, is never presumed.

On the other hand, the record affirmatively shows that the circumstances surrounding the prosecution of the original application afforded ample opportunities for errors to occur. Toulon, the client, was in Europe and there is no evidence that Hodges ever met or talked to him. All communications between them were made through intermediaries, Polydoroff and his associate Langley, and Frumkine, Toulon's attorney in Paris, France. The induction of Toulon into the French armed services occurred in September 1939 and the induction of attorney Frumkine therein in November 1939, with the reasonable inference that both of them were in a transitional period of preparation for said inductions for some time prior to said dates. Toulon's attorneys failed to procure an accurate translation of the Convention document upon which the application for the original patent was based. A change of attorneys for Toulon occurred on August 6, 1938, when Kenyon & Kenyon [15] were dismissed, be-

---

part of the term of the original patent. No new matter shall be introduced into the application for reissue.

\* \* \* \* \*

"No reissued patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent."

13. 35 U.S.C.A., Appendix II, § 64, pro-

vides in part: "Whenever any patent is wholly or partly inoperative or invalid, \* \* \* if the error has arisen by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, \* \* \*."

14. 35 U.S.C.A. preceding section 1, § 4(a).

15. They were attorneys of record for Toulon up to that time in prosecuting the original application.

cause of "a matter of expenses," and Hodges was substituted[16]. Hodges did not fully comprehend the nature, advantages and scope of Toulon's invention, due to his limited experience in the patent field. He was not registered to practice in the patent office until about a year after the original application for Toulon was filed in the name of Kenyon & Kenyon by Hodges as "associate attorney." Langley, who was acting as agent for Toulon, announced his intention in October 1939, to release Hodges from further duty as Toulon's attorney.

Under these circumstances, a patent was issued with claims whose breadth deviated from those to which Toulon was entitled under the invention which he disclosed. The breadth of the claims, therefore, through error, was incorrectly set forth and they, therefore, failed, as stated, to cover the scope of his invention. Within that scope fell Loughren's discovery.

This was a situation to which the law on reissuance of patents became directly applicable.

4. In this court Avco contends that the claims in issue are invalid over Smith patent 2,132,654.

Professor Hazeltine explained the rather elaborate system described in that patent. According to his testimony, it is apparent that there are a number of essential and basic distinctions between the disclosure of the Smith patent and the Toulon invention: (1) The Smith circuit does not relate to a television receiver as does Toulon, but to a transmitter, which has a quite different principle of operation and presents quite different synchronizing problems. (2) The synchronizing wave is transmitted on a channel separate from the picture signals, an arrangement which would render it unsuitable for synchronizing an electronic television receiver. (3) The synchronizing wave is transmitted by wire rather than by radio, so that it is inherently relatively immune to disturbance by noise interference and is not confronted with the problem to which the Toulon invention is directed. (4) The oscillator of the Smith patent is synchronized by a low-frequency 60-cycle sine wave from an ordinary power line, a system which is relatively insensitive to noise disturbances because of the high-power level. (5) The oscillator which is synchronized operates at a frequency of 20,580 cycles per second, a frequency many times greater than (not substantially the same as) the 60-cycle power line from which it is synchronized.

He also testified that the following essential features of the Toulon invention are lacking from the Smith disclosure: (1) A system for precisely controlling the synchronization of an electronic television receiver from a series of received synchronizing pulses of short duration relative to their period. (2) Means for substantially eliminating the effect of noise pulses similar in nature to the synchronizing pulses of short duration and the effect of momentary synchronizing-signal interruption. (3) A circuit for supplying periodic synchronizing pulses of short duration to the system. (4) A relaxation oscillator which, in the absence of control, has substantially the same average frequency as the incoming synchronizing wave. (5) A circuit for developing from the output of a controlled relaxation oscillator a sawtooth wave for scanning.

The Smith patent was cited and considered by the patent office in the prosecution of the Toulon reissue patent application and was found not to be an anticipation of the Toulon patent claims in suit. The Smith system differs from the Toulon invention in many important respects related to the fact that it is comprised in a transmitter and not a receiver. It lacks the majority of the essential features of the Toulon synchronizing system.

16. He was associated with Langley, a consulting engineer.

■ The district court by its findings confirmed the rulings of the patent office and the testimony of Alan Hazeltine to the effect that the Smith patent does not anticipate the Toulon invention.

■ Moreover, we also rely upon the thought expressed in Williams Mfg. Co. v. United Shoe Mach. Corp., 6 Cir., 1941, 121 F.2d 273, at page 277; affirmed 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537:

"* * * To the presumption of validity that attaches to a granted patent, where the most pertinent prior art has been cited against it in the patent office, there must probably now be added the force of a growing recognition of finality that is generally being accorded to administrative determinations supported by evidence, on the ground that the administrative agency is expected to have developed an expertness in its specific field beyond what may be expected from the courts wherein adjudications range the whole field of human controversies. * * *"

■ 5. The district court found that defendants have manufactured and sold within the Northern District of Illinois television receivers identified as model 11–445 MU, which include a synchronizing circuit which, in all material respects, is essentially the same as that described and claimed in the Toulon patent in suit and which operates on the same principles and produces the same results as that described in said patent, and the district court arrived at a conclusion of law that each of claims 5, 6, 7, 9, 10 and 13 of Toulon patent Re. 22,055 is infringed by the model 11–445 MU television receivers manufactured and sold by defendants.

In this finding [17], as well as in this conclusion of law, we concur.

■ 6. Avco contends that the reissue patent is unenforceable because it was obtained by fraudulent misrepresentations to the patent office. However, the district court found as a fact that "the record fails to establish that there was any fraudulent representation or misrepresentation of any material fact to the Patent Office or concealment of any material fact from the Patent Office in connection with the filing of such reissue application or its prosecution." We believe that the evidence in the record supports this finding.

■ Moreover, it has been held that a person "sued for infringement will not be permitted to set up as a defense that the patent was fraudulently obtained, no fraud appearing on its face." Alliance Securities Co. v. J. A. Mohr & Son, D.C., 14 F.2d 793, 798. The leading case is Mowry v. Whitney, 14 Wall. 434, 81 U.S. 434, 20 L.Ed. 858. To the same effect are Rubber Co. v. Goodyear, 9 Wall. 788, 789, 76 U.S. 788, 789, 19 L.Ed. 566; Philadelphia, W. & B. R. Co. v. Dubois, 12 Wall. 47, 64, 79 U.S. 47, 64, 20 L.Ed. 265; United States v. American Bell Telephone Co., 128 U.S. 315, 373, 9 S.Ct. 90, 32 L.Ed. 450. Buckingham Products Co. v. McAleer Mfg. Co., 6 Cir., 108 F.2d 192, at page 195, and Carson Inv. Co. v. Anaconda Copper Mining Co., 9 Cir., 26 F.2d 651, 660.[18]

7. Avco contends that plaintiff has misused its patents, thus rendering the patent in suit unenforceable, and that plaintiff has "block-booked" its patents, which, it says, is both a misuse and an anti-trust law violation. More specifically Avco says that plaintiff has used the Toulon patent in an attempt to force Avco and others to take a license under all of its 600 patents; and plaintiff has worked in concert with Harold M. Lewis

---

17. This finding is supported by the testimony of Professor Hazeltine. In detail he pointed out to the district court the substantial identity of the physical elements of the Toulon patent to those of the Avco receiver and the similar method of operation of the Toulon circuit and the Avco receiver.

18. We here digress. Plaintiff in its brief,

when discussing this subject says, "This rule was reiterated in the case of Mahn v. Harwood, 1884, 112 U.S. 354 [5 S.Ct. 174, 6 S.Ct. 451, 28 L.Ed. 665]" and then quotes a statement, referring to it as being on page 365 of 112 U.S. This quoted statement is not from the opinion of the court, but from the dissenting opinion of Miller, J.

to use Lewis patent 2,208,374 which was assigned to Lewis by plaintiff for that purpose, to attempt to force Avco and others to take a license under all of its 600 patents.

 Plaintiff is in the business of research and selling patent licenses. It has licensed more than 150 manufacturers of radio and television receivers under its standard license form, each embracing all of plaintiff's 600 patents. Under this form, royalties are payable on total production of radio and television receivers, regardless of the extent to which the licensee uses any Hazeltine patent. The standard Hazeltine license was considered by the court in Automatic Radio Mfg. Co., Inc., v. Hazeltine, 1950, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312, where it was contended, *inter alia*, that that case was identical in principle with the "tie-in" cases and that the licensing provision, requiring royalty payments of a percentage of the sales of the licensee's products, constitutes a misuse of patents because it "ties in" a payment on unpatented goods. At page 833 of 339 U.S., at page 897 of 70 S.Ct., the court said:

"This royalty provision does not create another monopoly; it creates no restraint of competition beyond the legitimate grant of the patent. The right to a patent includes the right to market the use of the patent at a reasonable return. * * *

"Payment for the privilege is required regardless of use of the patents."

Further, at page 834, of 339 U.S., at page 898 of 70 S.Ct., the court added:

"The mere accumulation of patents, no matter how many, is not in and of itself illegal. * * * We cannot say that payment of royalties according to an agreed percentage of the licensee's sales is unreasonable. Sound business judgment could indicate that such payment represents the most convenient method of fixing the business value of the privileges granted by the licensing agreement. We are not unmindful that conveni-

ence cannot justify an extension of the monopoly of the patent. See, e. g., Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 666, 64 S.Ct. 268, 271, 88 L.Ed. 376; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 408, 86 L.Ed. 367. But as we have already indicated, there is in this royalty provision no inherent extension of the monopoly of the patent. Petitioner cannot complain because it must pay royalties whether it uses Hazeltine patents or not. What it acquired by the agreement into which it entered was the privilege to use any or all of the patents and developments as it desired to use them. If it chooses to use none of them, it has nevertheless contracted to pay for the privilege of using existing patents plus any developments resulting from respondent's continuous research. We hold that in licensing the use of patents to one engaged in a related enterprise, it is not *per se* a misuse of patents to measure the consideration by a percentage of the licensee's sales."

Furthermore, Avco contends that as a matter of fact plaintiff has used the Toulon patent and the Lewis patent, and has worked in concert with Lewis to use the Lewis patent, in such a way as to constitute misuse thereof.

Lewis was employed by plaintiff's organization from 1930 to 1946, during which time he made the invention forming the subject matter of patent 2,208,-374. In 1949 when that patent was held to be valid and infringed by Admiral, Hazeltine Research, Inc., v. Admiral Corporation, D.C., 87 F.Supp. 72; Id., 7 Cir., 183 F.2d 953, certiorari denied 340 U.S. 896, 71 S.Ct. 239, 95 L.Ed. 650, Lewis was no longer connected with plaintiff. As a means of recognizing that one of his inventions, sustained by litigation, had proved to be of substantial value, an agreement was made between plaintiff and Lewis, under which it assigned the patent to Lewis, including all claims for past infringement thereof, but reserved

to itself a royalty-free non-exclusive license, together with the right to grant non-exclusive sublicenses to others, and to make, use and sell apparatus embodying said invention, and under which Lewis agreed to promote, at his own expense, the licensed use of said invention, and to bring and prosecute such suits for infringement thereof as in the judgment of Hazeltine might·be reasonably necessary and prudent for enforcing said patent and preventing unlicensed use of the invention thereof. In said agreement, Lewis granted to plaintiff an irrevocable option to repurchase said patent and all then existing claims for infringement thereof not at the time of repurchase reduced to a liquidated value, together with any licenses which Lewis may have issued, at a price to be negotiated between the parties but in any event not to exceed $25,000.

On December 1, 1950, plaintiff wrote Avco claiming infringement of the Toulon reissue patent and others, including Lewis patent 2,208,374.

By its agreement with Lewis, plaintiff gained nothing other than the satisfaction of what it considered a moral obligation. Its right to enforce the Lewis patent is not greater, but actually is less than before it entered into the agreement. It previously had complete control of that patent and could bring suit whenever it chose. Under the agreement, however, it had to request Lewis to bring suit in proper cases. If Avco's charge of coercion on the part of plaintiff in requiring Avco or others to accept licenses of all of plaintiff's patents were well founded, plaintiff would have been in a much better position to exercise such coercion if it had not assigned the Lewis patent to Lewis under the said agreement.

After execution of that agreement, plaintiff instructed Lewis to sue Trad Television Corporation, Video Products and Avco on said patent. Plaintiff offered to "undertake to satisfy Mr. Lewis' claims" if Trad would take a standard

Hazeltine license under all Hazeltine patents, which was done.

Lewis' suit against Avco was filed on the same day [19], by the same attorneys, in the same court as the case at bar and plaintiff is paying the compensation of the attorney who is acting as a trial lawyer in the Lewis case.

In response to an inquiry, the attorneys for plaintiff and Lewis advised Avco's counsel that if Avco would accept the standard Hazeltine license as of November 1, 1951, plaintiff would undertake to obtain the dismissal of this action and also the suit brought by Lewis against the defendants herein.

Belatedly, in its reply brief in this court, Avco for the first time makes a contention that the agreement between plaintiff and Lewis was champertous. Even if seasonably presented, we do not believe that this contention is meritorious. Plaintiff is not suing defendants upon that agreement.

Moreover, champerty has been defined, 14 C.J.S., Champerty and Maintenance, § 1, p. 356, as follows:

"Champerty consists of an agreement whereby a person without interest in another's suit undertakes to carry it on at his own expense, in whole or in part, in consideration of receiving, in the event of success, a part of the proceeds of the litigation."

Under the terms of the Lewis agreement with plaintiff, both had a real interest in the Lewis patent and in the suits which Lewis instituted for infringement thereof. Those suits were only partly for the benefit of plaintiff. Lewis agreed to pay the expense thereof. Champerty is not involved in this case.

We do not agree with Avco's contention·that the acts of plaintiff and Lewis, or either of them, amount to coercion. Avco contends that evidence of conversations between its representatives, and one Admiral Shea, Hazeltine's agent, indicates that Avco asked for license terms

19. October 17, 1951.

on a few patents and that none were ever given. Avco further contends that plaintiff implied Avco would have to accept licenses of all of plaintiff's patents, or none. We do not believe that the evidence so indicates.

In view of the fallacious conclusion of Avco that the other facts hereinbefore detailed amount to coercion, and in view of the holding in Automatic Radio Mfg. Co., Inc., v. Hazeltine, supra, we conclude that plaintiff is not guilty of either misuse of its patents or an anti-trust violation in connection therewith.[20]

For the reasons above set forth, the judgment from which defendants appeal is

Affirmed.

---

20. The district court excluded certain evidence offered by defendants, which they say was in support of their contentions that plaintiff was guilty of misuse of patents and an anti-trust violation. We have examined this proffered evidence and find that, if received, it would not have affected the result at which we have arrived and therefore the error, if any, was harmless.