**HAZELTINE RESEARCH, INC., Plaintiff and Counter-Defendant, Appellant,**

v.

**ZENITH RADIO CORPORATION, Defendant and Counter-Claimant, Appellee.**

**HAZELTINE CORPORATION, Plaintiff and Counter-Defendant, Appellant,**

v.

**ZENITH RADIO CORPORATION, Defendant and Counter-Claimant, Appellee.**

Nos. 15246, 15247, 15563, 15564.

United States Court of Appeals Seventh Circuit.

Dec. 19, 1967.

Rehearing Denied Jan. 23, 1968, en banc.

John T. Chadwell, Victor P. Kayser, C. Lee Cook, Jr., Joseph V. Griffin, M. Hudson Rathburn, Chicago, Ill., Laurence B. Dodds, Little Neck, N. Y., John W. Thomas, Chicago, Ill., for appellant.

Thomas C. McConnell, Dugald S. McDougall, Francis W. Crotty, Chicago, Ill., for appellee.

Before CASTLE, KILEY and CUMMINGS, Circuit Judges.

KILEY, Circuit Judge.

This infringement suit was begun by Hazeltine Research, Inc. (HRI) in November, 1959, against Zenith Radio Corporation for patent infringement. In May, 1963, Zenith counterclaimed, seeking treble damages for HRI's violation of the antitrust laws in the use of its patents. The district court entered judgments[1] against HRI and Hazeltine Corporation, its parent, on the issues of validity, infringement, patent misuse and antitrust violations, and awarded treble damages of $34,961,631 to Zenith on its counterclaim. HRI has appealed from the judgments against it. Hazeltine Corporation has made a motion to vacate the judgments against it and has filed provisional appeals from the judgments.

We vacate the judgments against Hazeltine Corporation. We affirm the district court judgment holding the patent in suit invalid. We affirm the judgment of the district court for Zenith, and against HRI, with respect to its domestic patents for treble the amount of $50,000, or $150,000. We reverse the judgments for treble damages based upon HRI's alleged participation in foreign patent pools in violation of the antitrust laws. We modify in some respects the injunction issued by the district court. And we remand for the sole purpose of entry of a judgment against HRI and for Zenith in the amount of $150,000 and entry of a modified injunction in accordance with this opinion.

*Hazeltine Corporation's Motions*

Under Rule 15(f)[2] of this court Hazeltine Corporation has made motions to vacate the judgments against it, upon Zenith's counterclaim, as void for want of jurisdiction over its person. We ordered that the motions be taken with the case on the full record.

---

1. On April 5, 1965, the district court entered judgment against HRI and Hazeltine Corporation on the issues of infringement, validity, patent misuse and on the issues raised by Zenith's counterclaim relating to patent misuse and the Canadian patent pool. The damages as trebled amounted to $150,000 for patent misuse and $18,892,173 for the alleged antitrust violations arising from participation in the Canadian patent pool. On December 13, 1965, the district court entered judgment against HRI and Hazeltine

Corporation in the amount of $15,919,458 as treble damages for alleged injuries to Zenith because of allegedly unlawful conduct of English and Australian patent pools.

2. Rule 15(f) of this court provides that a substantial jurisdictional question may be raised by motion for determination before the hearing on the merits. The questions raised in the motions are identical.

Hazeltine Corporation is sole owner of HRI. The Corporation is engaged primarily in the business of research, development and manufacture of electronic equipment for military and commercial use. HRI is engaged primarily in research, development, ownership and licensing of United States patents relating mainly to radio and TV. The Corporation was not named as a party in the counterclaim, was not served with process, did not participate in the trial and filed a "special appearance" contesting entry of judgment after the district court adopted findings of fact and conclusions of law naming the Corporation as a party for the first time.

The district court found that "the parties stipulated that for the purposes of this litigation Hazeltine Research, Inc. and its parent, Hazeltine Corporation would be considered as one entity operating as a patent holding and licensing company, engaged in the exploitation of patent rights in the electronics industry in the United States and in foreign countries." The court made no other findings relating to "piercing the corporate veil," and our reading of the colloquies between counsel and the court leads us to the conclusion that the stipulation was the principal if not the only basis for binding the Corporation in the judgments.

Hazeltine Corporation contends that the trial court had no jurisdiction to enter judgment against it because it was not served and was not a party; that in its counterclaim Zenith recognized the separate identities of HRI and Hazeltine Corporation and sought judgment against counter-defendant HRI alone; that Hazeltine Corporation did not defend against the charge; that the stipulation, drawn by Zenith and signed by Zenith and HRI, did not justify binding the Corporation in the judgments sought; that before and during the trial Zenith indicated no construction of the stipulation as making the Corporation a party and did not move to amend the pleadings by naming the Corporation; that the findings of January 25, 1965, indicate no intention that the judgments would

run against the Corporation; that it learned Zenith would seek to enforce judgment against it the day following entry of findings; and that the first suggestion in the district court of being bound came only in the proposed form of judgment submitted by Zenith on March 19, 1965.

Zenith relies upon (a) the stipulation, (b) Hazeltine's disregard of the "corporate fiction" during discovery beginning in June, 1960, by responding to subpoenas duces tecum against the Corporation without question, by submitting to deposition of the Corporation at its offices in New York with production of files of domestic and foreign patents and by the obedience of the Corporation to court orders, and (c) the dual office of plaintiff's attorney Dodds as officer of both HRI and the Corporation, certain correspondence during 1963 and "control" of the litigation by the Corporation. It relies too upon a finding of fact proposed by plaintiff:

8. It is stipulated that, for the purposes of this Action, Hazeltine [HRI] and H. C. may be considered a single legal entity to avoid the issue of whether or not it is appropriate to "pierce the corporate veil," but it is proper to consider the separate and unrelated activities of the two companies separately.

It further depends upon proposed findings of fact and conclusions of law favoring the Corporation. On the basis of all this, Zenith contends that Corporation is the alter ego of HRI and that the finding "piercing the corporate veil" was not clearly erroneous.

The general principle controlling this case was well stated by the Supreme Court in Hansberry v. Lee, 311 U. S. 32, 40–41, 61 S.Ct. 115, 117, 85 L.Ed. 22 (1940):

It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service

of process. \* \* \* A judgment rendered in such circumstances is not entitled to the full faith and credit which the Constitution and statute of the United States \* \* \* prescribe \* \* \*; and judicial action enforcing it against the person or property of the absent party is not that due process which the Fifth and Fourteenth Amendments require.

■ Since Hazeltine Corporation was neither named nor served, the sole basis for liability on the judgment is the theory that HRI is its alter ego. We cannot say that the Corporation was "adequately represented" here on the alter ego issue. 311 U.S. at 42–43, 61 S.Ct. 115, 85 L.Ed. 22. The resolution of the alter ego issue can be made only after an adversary determination of the facts involved. This court cannot make an initial determination of these facts, and the district court did not do so.

■ The issue became apparent in the district court only after the district court had filed its findings and conclusions. And at no time during the trial did the Corporation have an opportunity to show that it was not the alter ego. The Corporation's appearance to argue the issue after the trial was not sufficient opportunity to be heard under the due process clause.

Zenith's contention that HRI adequately represented the Corporation's interests on the alter ego issue begs the question. On this issue, only the Corporation itself could have protected its own interests.

■ We think Merriam Co. v. Saalfield, 241 U.S. 22, 36 S.Ct. 477, 60 L.Ed. 868 (1916), refutes Zenith's contention that control of the litigation by Hazeltine Corporation made it amenable to joinder after findings of fact and conclusions of law were adopted without service of process. In *Merriam* it was clear that Ogilvie had controlled the defense for Saalfield, the defendant named in the original suit. Here the facts are only that Dodds, attorney for plaintiff HRI, was an officer and a counsel for the Corporation. There is no showing that he was authorized to act

for the Corporation. We find no basis for joining the Corporation because of its claimed participation in the trial.

■ The stipulation relied upon by Zenith and the district court was signed only by the "parties" to the counterclaim, and the Corporation was not a party. And there is no showing that the Corporation authorized HRI's representative to sign on its behalf.

■ We see no reason why the Corporation's disclosures of its files and obedience to subpoenas in connection with HRI's infringement suit should bind the Corporation as a party to a subsequent antitrust counterclaim in which it is not joined as a party.

No case cited by Zenith is applicable to the facts here. The cases cited assume there was such control of HRI as to render the latter the Corporation's agent (and in our view there is no showing of that fact on the record); and that HRI and the Corporation are the same identity, an alter ego relationship unwarranted on this record. Zenith had the burden of establishing clearly that Dodds had authority to represent the Corporation in entering the stipulation prepared by Zenith or that the Corporation was in fact the alter ego of HRI. We hold Zenith did not meet that burden.

The judgments against the Corporation are void and must be vacated.

### The Patent Issues

The HRI patent in suit, 2,547,648, (648), and Zenith's accused device, are both circuits used in TV receivers. The pertinent claims in issue have the purpose of automatically adjusting the variations in strength of signals transmitted from TV stations to receivers so as to maintain a uniform picture in the receiver. The district court denied recovery of damages for Zenith's alleged infringement on the ground that the claims in suit were invalid, that Zenith's device did not infringe and that HRI's misuse of its patent precluded it from recovery. The claims were found invalid on the alternative grounds that they defined no patentable invention over prior art and that the

invention disclosed was in public use more than one year prior to October 8, 1949, when HRI "amended" its original application so as to include the claims before us.

The important question before us is whether the district court properly decided that the 1949 "amendment" was not entitled to the 1946 filing date of HRI's original application. If the district court properly decided this question, its decision of invalidity is right. We hold that the record viewed as a whole substantially supports the district court's finding that HRI was not entitled to the earlier filing date and that the claims in suit were invalid. We express no opinion upon the other issues bearing upon the infringement claim.

The record discloses that the original application was filed January 25, 1946, that RCA published a bulletin March 15, 1949, disclosing different means of achieving the purpose of the claims in HRI's original patent, and that HRI's 1949 "amendment" discloses essentially the same means. The district court found that HRI's 1949 application sought a continuation of the original application, but that there was no basis in the original claims which justifies relating the 1949 claims to the original. These findings are challenged by HRI. The court further found that the RCA bulletin in 1949 motivated HRI's "continuation application."

In disposing of HRI's challenge of the district court's finding that there was no basis in HRI's 1946 application for allowing the 1949 claims the benefit of the 1946 filing date, we think it is necessary to briefly outline the basic principles of TV transmission and reception in order to understand the nature and function of the part of the TV receiver subject of the claims in suit.

In the transmission of a TV program to a receiving set, the camera image is rapidly scanned, as in a person's reading, by an electron beam sweeping from side to side, with each sweep progressively lower until the entire image is scanned. The intensity of the beam varies with the brightness of the point of the image being scanned. The varying electric current thus created is used to generate radio waves with corresponding intensity variations. The transmitted radio waves are received in the TV set, transformed into electric current with corresponding intensity variations, amplified, and used to vary the intensity of an electron beam scanning the TV screen, thus reproducing the image.

The beam in the TV set must scan the screen in exact synchronization with the beam in the camera. To accomplish this, synchronization pulses are included in the transmitted radio wave, representing the end of each line and the end of the field or complete picture. In the receiver, these pulses are used to govern the timing of the scanning operation.

"Sync" pulses are also used in another manner in the receiver. The intensity level of the pulses is higher ("blacker," since high intensity represents black and law intensity represents white in the signal) than the intensity level of the rest of the radio wave, and its intensity at the time of transmission is a known factor which is constant in all transmissions. The strength of a particular station's over-all signal can therefore be determined by the intensity level of the "sync" pulse. The picture tube of a TV set must receive a signal with a reasonably uniform range of intensity to perform properly. Thus, the signals of weaker or distant stations or those affected by atmospheric conditions must automatically receive more amplification than stronger signals.

The basic principle of the patent in suit, 648, involves using the intensity level of the "sync" pulses in a particular signal to generate a control voltage which in turn controls the degree of amplification needed to produce reasonable uniformity in reproducing the picture transmitted. For example, the signal of a strong nearby station will include high intensity "sync" pulses, and, through the device in suit known as an AGC circuit, these pulses will be used to generate a control voltage which in turn will auto-

matically reduce the amount of amplification.

In the fall of 1945 when HRI began work toward perfection of its device, the basic method for adjusting the strength of signals reaching a TV receiver by the use of the "sync" pulse to produce a control voltage in an integrating load circuit was well known. This feature is used in the patent in suit and the accused device, and in other AGC devices.

In 1945, however, the AGC circuit in use was fed with current supplied from the video detector part of the receiver. This process did not produce the desired sensitivity of adjustment and although by adding a DC amplifier the desired sensitivity would be gained by increasing the voltage fed into the AGC circuit, this would require an additional stage of amplification in the receiver which was not commercially desirable. HRI's work in 1945 was aimed at achieving the desired sensitivity of the AGC circuit by obtaining the signal voltage used in the AGC circuit from the video amplifier rather than the video detector. This would increase the voltage fed through the AGC circuit and increase the circuit's sensitivity without the necessity of an additional amplification stage. The idea was not new, but a major difficulty prevented its being applied in practice: The AGC controlled voltage had to be negative with respect to the ground, but the DC voltage level at the point in the receiver following the video amplifier was positive with respect to the ground.

HRI's original 1946 application disclosed a means of overcoming the above problem and deriving the signal voltage from the video amplifier, for use in the AGC circuit. The video amplifier was connected in a series circuit with a diode rectifier, a source of alternating current of approximately equal voltage to that at the video amplifier and an integrating load circuit. The aim was to offset the positive polarity of the voltage at the video amplifier so that the AGC circuit would produce control voltage having the required polarity.

HRI's "continuation application" was filed October 8, 1949, and added the claims now in suit which are considerably broader than the original claims, and we think the record justifies the court's inference that the additional claims were motivated by the RCA bulletin of March 15, 1949, which disclosed a different means of deriving voltage from the video amplifier for the AGC circuit. HRI's additional claims were designed to cover the RCA disclosure. The Patent Office issued HRI's patent in suit, 648, containing the 1949 claims, on April 3, 1951.

In the 1949 RCA means and the HRI claims in suit, unlike the means disclosed in HRI's 1946 application, the video amplifier is connected to a grid controlled vacuum tube. This tube has three types of electrode components, a cathode, an anode, and one or more grids. The grid is placed between the cathode and anode to control the flow of electricity between them. Electricity normally flows from cathode to anode when the anode has a positive voltage with respect to the cathode. If the grid is made negative with respect to the cathode it acts as a gate to control the current flowing between cathode and anode. As the grid is made more negative with respect to the cathode, the flow of electricity between cathode and anode is reduced and if the grid is made sufficiently negative the flow will be cut off.

The grid in the RCA grid control tube is connected to the video amplifier and a source of alternating current is connected with the anode, to which the alternating current supplies positive pulses. When the grid is positively charged by the video amplifier and the anode is positively charged by the alternating current, electrons will flow from the cathode to the anode and be thus fed into the AGC circuit where the required control voltage will be produced to adjust the strength of transmitted signals picked up by the receiver.

The district court had ample support for finding substantial differences be-

tween HRI's original disclosures in 1946 and the claims sought by the 1949 application. The devices clearly operate differently. Unlike the RCA device, HRI's original device provided for a series circuit connection between the video amplifier, a diode, a source of alternating current and an integrating load circuit. In HRI's original claims the alternating current, unlike RCA's, must be set at a specific level to offset positive voltage at the video amplifier. HRI's original claims utilize a diode. RCA's uses a grid control tube. HRI's original claims require offsetting positive voltage at the video amplifier, but RCA's device uses that positive voltage to control the flow of current to the integrating load circuit. The HRI device originally claimed meets the same need as RCA's, but by entirely different means. It is significant that the HRI device originally disclosed has never been incorporated in any TV receiver sold in the United States, while RCA's device, or similar devices, have become standard features in most TV receivers.

 Having found no error in the court's finding that the claims in suit constituted new matter, the conclusion of invalidity follows. The continuation, under 35 U.S.C. Sec. 120, may not be used to permit HRI to claim new material not disclosed in the original application and not invented by it so as to cut off intervening rights. The disclosures made by RCA in March, 1949, were either the property of RCA or of the public and could not be appropriated by HRI. C. & N. W. Railway Co. v. Sayles, 97 U.S. 554, 24 L.Ed. 1053 (1878); Schriber-Schroth Co. v. Cleveland Trust Co., Chrysler Corporation, 305 U.S. 47, 573, 59 S.Ct. 8, 83 L. Ed. 34 (1939).

We need not pass on the issue of infringement.

### The Misuse Issues

Although we affirm the district court's judgment of invalidity, we must nevertheless decide the issue of patent misuse, since Zenith's counterclaim sought to recover, and had judgment for, damages as a result of HRI's alleged patent misuse.

The district court found that Zenith's five year "standard package license" (including over 500 patents) from HRI was about to expire in 1959; that Zenith rejected HRI's offer of renewal on the ground that it needed no license; that HRI then asserted infringement by Zenith of four monochrome (black and white) TV patents and offered a license under a formula providing for any one patent at a royalty rate of 50% of the package rate, for any two at 80%, and for any "three or more" at 100%, with rates based upon Zenith's total production, whether the patents were used or not; that Zenith refused the offer, and this suit followed; and that under the circumstances, this offer was "an attempt by economic coercion to force the taking of the package."

The court found that after suit was filed HRI informed Zenith it was infringing nine color patents and again offered the package license; that Zenith again refused to accept; that in April, 1962, HRI offered to license (1) use of the nine color patents at an annual royalty rate of $435,000 or (2) use of all color patents issued and applied for at an annual rate of $500,000 or (3) the package of all monochrome and color patents at an annual rate of $150,000; and that Zenith refused.

The court further found that in March, 1963, before trial, HRI made a final offer "obviously" intended to force the package license upon the unwilling Zenith; that under this offer the options were (1) payment of $275,000 per year in royalties for use of nine color patents, (2) payment of $300,000 per year for use of all extant color patents, (3) payment of $310,000 for all extant and future color patents, or (4) payment of $200,000 for the package of all patents, color and monochrome, extant and future, at an annual maximum of $200,000; and that the only alternative to accepting one of these options was costly infringement litigation. The court found that the only practical answer to the dilemma was acceptance of the standard package under the compulsion of economic coercion.

The district court concluded that the demands upon Zenith were unlawful economic coercion which, coupled with this suit and threats of other suits, constituted an illegal attempt to force acceptance of the standard package and a misuse of patents to unlawfully extend HRI's patent monopoly, and awarded damages based on Zenith's expenses in defending this suit and in investigating other patents asserted.

■ We think there is substantial evidence in the record to support the findings with regard to the misuse inherent in HRI's 1962 licensing offer. Zenith's witness Crotty testified to the offers, substantially as found, from HRI representatives. HRI's president testified that Crotty could have read HRI's proposal the way Crotty had read it and admitted the offer of a package at a substantially lower rate than the "total" of the fewer than all rates. And HRI's attorney agreed with the district court that if the figures were right and if a licensee could get the package for considerably less than for nine patents an inference could be drawn that "somebody" was trying to sell a package rather than individual patents. HRI's claim of innocent mistake in drafting the offers is refuted by interoffice memos including one where patent counsel had informed his superior that the offers risked a charge of patent misuse and were apt to be viewed as "just what we intended—a transparent attempt to force them into package."

■ The substance of HRI's contention is that a licensor can offer to license any number of patents less than all in the package for the same total royalty, so long as that royalty is reasonable for any one of the patents and so long as he does not refuse to license individual patents. It relies upon the Supreme Court's decision in Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S. Ct. 894, 94 L.Ed. 1312 (1950), and this court's decision in Hazeltine Research, Inc. v. Avco Mfg. Corp., 227 F.2d 137 (7th Cir. 1955), cert. denied, 350 U.S. 987, 76 S.Ct. 474, 100 L.Ed. 854 (1956). The holding in *Automatic Radio* was that

it is not *per se* misuse of a patent to measure the royalties by a percentage of the licensee's sales when the licensee is engaged in a related enterprise. The Court refused to consider the package licensing claim there, however, because there was nothing in the record to support it, 339 U.S. at 827, 70 S.Ct. 894, 94 L.Ed. 1312. And in *Avco* we held that the record did not compel a finding of coercion. Neither of those cases is in point here.

In American Securit Co. v. Shatterproof Glass Corp., 268 F.2d 769 (3d Cir.), cert. denied, 361 U.S. 902, 80 S.Ct. 210, 4 L.Ed.2d 157 (1959), refusal to license individual patents was held to be misuse *per se*. We see little difference between outright refusal to license less than a package and the economic coercion of HRI found, with reason, by the district court here. See Report of the Attorney General's National Committee to Study the Antitrust Laws 239–240 (1955); Diggins, The Patent-Antitrust Problem, 53 Mich.L.Rev. 1093, 1105 (1955).

■ The district court concluded erroneously that HRI's 50% for one-80% for two-100% for three or more patents formula offered Zenith in 1959 was unlawful economic coercion. This court has not considered the formula *per se* unlawful. Apex Electrical Mfg. Co. v. Altorfer Bros., 238 F.2d 867 (7th Cir. 1956). Actually the formula allowed licensees to save money by taking licenses of less than three patents. Eight TV manufacturers took licenses for only one patent under the formula, the one here in suit. There were only three HRI patents in general use in 1959 and therefore the formula appears reasonable in light of commercial realities. Zenith under the offer was free to take a license only for what it needed. Although discussion of a license between Zenith and HRI originally involved four patents, the discussion narrowed to the patent in suit, Zenith's rejection of the offer, and HRI's infringement suit.

We think our conclusion affirming the trial court's determination of misuse in conjunction with the 1962 offer is strengthened by the Supreme Court's decision in United States v. Loew's, Inc.,

371 U.S. 38, 54–56, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962), where it approved the district court's injunction against economic coercion similar to that here in a case involving refusal to "book" less than a package of films for television use.

 There is no merit in HRI's contention that the misuse of its patents, including the one in suit, furnishes no basis for an award of treble damages. The requisite anti-competitive effect is presumed where the tying product is patented. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). See United States v. Loew's, Inc., 371 U.S. 38, 45, 83 S.Ct. 97, 9 L.Ed. 2d 11 (1962). Zenith's expenses in defending the infringement suit brought pursuant to HRI's antitrust violations are a proper subject of threefold recovery. Dairy Foods, Inc. v. Dairy Maid Prod. Cooperative, 297 F.2d 805, 809 (7th Cir. 1961).

The district court's determination of Zenith's $50,000 basic damages for HRI's patent misuse represented, according to the findings, expenses incurred in Zenith's preparation for the 1963 trial of HRI's infringement suit and in investigating HRI patents asserted against Zenith. The $50,000 figure is not here, and as far as we are informed by HRI, was not challenged at trial. In view of HRI's unlawful conduct commencing in 1962, and the size of the record of trial of the infringement issues, we cannot say the basic damages are so unreasonable that we must set aside the allowance. We affirm the treble damage judgment of $150,000.

### The Antitrust Issues

Zenith's treble damage counterclaim was filed May 22, 1963, alleging violation by HRI of the Sherman Act, 15 U.S.C. Secs. 1 and 2, by its alleged participation in conspiracies that unlawfully prevented Zenith from exporting its United States manufactured products into Australia,

Canada and England. Zenith was granted injunctive relief and treble damages on the counterclaim in the amounts of $745,380 as to the Australian market, $18,892,173 as to the Canadian market, and $15,174,078 as to the English market. The judgment followed for $34,811,631.[3]

 HRI challenges Zenith's judgment on several grounds. However, we think the crucial question is whether the district court's finding that Zenith was in fact damaged by the pools in the three countries during the four year damage period[4] preceding the filing of the counterclaim is clearly erroneous. Fed.R.Civ. R. (52(a)). We agree with HRI that Zenith failed to sustain the burden of proving the essential *fact* of damage in the relevant period. We need pass on no other contention, therefore, in reversing the judgment on the counterclaim.

 Zenith had the burden at the trial of showing an "injury to [its] business," 15 U.S.C. Sec. 15, by proving the unlawful conspiracies and the *fact* of damage as a proximate result of the alleged unlawful conspiratorial activities. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777.

The district court concluded that the alleged conspiracies had as their express purpose prevention of importation of TV apparatus made in the United States, that HRI by participating in the conspiracies had violated the Sherman Act and that Zenith had established that it had been injured in its business as a result of the unlawful activities of the pools. The court's ultimate finding of fact was that "the foreign commerce of Zenith has been drastically curtailed by the patent pools" in the three countries. The court stated that damages had been shown by experi-

---

3. The figures for England and Australia were reduced on December 13, 1965, upon further hearing after proofs were reopened.

4. Four years prior to the May 22, 1963, filing date of Zenith's counterclaim. 15 U.S.C. Sec. 15b.

enced Zenith officials thoroughly familiar with the business problems and sales potentials in the three markets.

The ultimate finding rests upon subsidiary findings that for "many years" before 1957 Zenith tried to establish distributorships in Canada but in "every instance" the Canadian distributor was warned to stop handling Zenith products or face expensive litigation; that Zenith sought import licenses but in "every instance" such licenses were refused them; that after the 1957 settlement Zenith began late in 1958 to export to Canada its radio and TV products through Zenith Radio Corporation of Canada; but that the pool demanded that Zenith discontinue the practice and accept a standard package license and manufacture in Canada any products sold there; and that soon after the demand the instant Hazeltine infringement suit was brought.

The Zenith officials whose testimony was relied on by the court were Zenith's president, its vice-president in charge of patents, and its manager of internal auditing and chief financial officer.

A good part of the president's testimony concerned activities of the pools before the settlement of RCA v. Rauland Corporation, 21 F.R.D. 113 (N.D.Ill.), in 1957. In that suit Zenith filed a treble damage counterclaim seeking damages for refusals to license similar to those alleged here, in settlement of which it obtained unrestricted cross-licenses from RCA, General Electric, and Western Electric Company, and in turn gave general releases to those three companies. The president also testified generally that after this settlement Zenith hoped to be able to compete freely in Canada with its competitors, but that unlawful pool activity continued into the damage period. His testimony was that because of the similarity between the Canadian and United States markets, he was convinced that Zenith, but for the "clouds and difficulties" caused by the pool's refusal of a license permitting Zenith to export to Canada, would have achieved the same percentage, 20% of the Canadian market as it enjoyed in the United States market,

and would have also captured 5% of the English market and 2% of the Australian market.

Zenith's vice-president gave his opinion corroborating the statement that in a market free of license restrictions Zenith would have the percentage shares that the president testified to.

Zenith's third witness took the percentages testified to by the president and vice-president and, through the use of a chart, calculated "lost sales and lost profits" based on past profit and cost data.

No specific findings were made with regard to how the alleged conspiracy prevented sales by Zenith in Australia. We see no necessity of discussing at great length Zenith's failure to prove the *fact* of damage with respect to the Australian market, since there is no testimony that could reasonably support a finding of *fact* of damage there. Until April, 1960, Australian government regulations prevented Zenith's selling radio and TV sets in that country. Zenith's case rests on the testimony of its officers that conversations between Zenith employees and Australian businessmen who were not members of the patent pool led it to believe that it could not obtain a license to import radio and TV receivers into Australia after 1960. There is no evidence that Zenith ever attempted to obtain a license from the Australian pool, nor is there any proof of use by the Australian patent pool of restrictive license forms to prevent import. Indeed, during the post-1960 period a large number of low priced Japanese radio and TV sets were sold in Australia. Actually, high import duties and shipping costs posed a formidable barrier to Zenith sales. There is no evidence to warrant the inference that Zenith intended to or was prepared to enter the Australian market. Triangle Conduit & Cable Co. v. National Elec. Prod. Co., 3 Cir., 152 F.2d 398; Volasco Prod. Co. v. Lloyd A. Fry Roofing Co., 6 Cir., 308 F.2d 383, 395.

We also conclude that Zenith failed to prove the *fact* of damage with respect to the English market. A World War II embargo prevented Zenith from import-

ing its products into England until June, 1959. At that date all basic radio patents had expired, and Zenith had no difficulty in doing radio business in England. The difficulty Zenith had in the English market with its TV products cannot reasonably be attributed to the activity of an unlawful conspiracy in that country. Significant barriers other than patent difficulties operated to prevent sales of Zenith TV receivers in England. Zenith sets manufactured in the United States operated on 525-line and 625-line scanning signals. The English standard was a 405-line signal until changed to 625-line after the damage period. Zenith sets sold in England would be in competition with substantially lower priced British sets. There was no testimony that the British pool, during the damage period, had threatened or filed suit on any patents.

We think it is unreasonable to infer that Zenith intended to and was prepared to enter the English television market during the damage period. The only reasonable inference is that it was waiting for a change in English standards to a 625-line system. Zenith was not aided, in showing loss of probable profits, by the testimony that its man in England could adjust Zenith sets to the English standard "with a screwdriver in the back of the shop in a few minutes."

We hold that the finding of the district court that Zenith had been injured in its business by the activities of the alleged unlawful conspiracies in Australia and England is clearly erroneous.

Zenith's president's testimony with respect to the Canadian market can be considered as some slight evidence of the *fact* of damage, being more specific than with respect to the other markets. He testified that in 1958 he complained to the Canadian pool about its advertisement in a Canadian trade journal addressed to television and radio dealers in Canada. He charged that the advertisement was false, and was damaging to Zenith's business, because it contained threats of infringement suits which were calculated to discourage distributors from handling Zenith products. This advertisement, he testified, was typical of threats made during the damage period. During his testimony, a letter, written during the damage period by a Zenith distributor in Canada with respect to threats made by the pool to a Motorola dealer, was read into the record.

Despite this testimony, the fact remains that during the damage period Zenith sold more than 65,000 radios and nearly 60,000 TV sets in Canada. It did not seek a pool license after 1953, claiming throughout the period that it had unrestricted cross-licenses as a result of the 1957 settlement which rendered pool licenses unnecessary. Zenith's president could not recall any specific threat of litigation over radios alone. Zenith's subsidiary in Canada has not been sued or threatened with suit for importing radios into Canada since 1957. There was testimony that Zenith had made no separate effort to import radios into Canada despite the fact that all basic radio patents had expired before the end of the damage period. There was no showing that the 1958 advertisement had any adverse effect on Zenith's sales.

No Canadian distributor was called as a witness by Zenith. The letter in 1962 from the Zenith dealer referring to the Motorola threat could imply that no Zenith distributor had been threatened. Although several of Zenith's United States competitors were doing business in Canada, Zenith made no showing of comparable experience of those competitors in the United States and Canada. Zenith was advised by the pool that it was infringing pool patents in 1959, but continued to export to Canada without any interruption. In 1960 it spent 11% of its Canadian TV sales and almost 13% of its radio sales on advertising. By 1961 it had achieved 5% of the television market, and the decrease in the share thereafter was not shown to have been caused by the pool.

We hold that even though there is some testimony of damage suffered by Zenith in the damage period as a result of pool activities in Canada, we have a firm con-

viction that the district court made a mistake in inferring from the entire testimony that the essential element of *fact* of damage had been established by Zenith. Milwaukee Towne Corp. v. Loews, Inc., 7 Cir., 190 F.2d 561, 566.

Zenith argues that HRI's instant infringement suit is in furtherance of the alleged Canadian conspiracy. There is nothing in the record to show that this suit had any effect to damage Zenith's Canadian business. The record shows that this claim was not taken seriously by the district court.

Zenith relies on this court's decision in Dairy Foods Inc. v. Dairy Maid Prod. Cooperative, 7 Cir., 297 F.2d 805, to support its argument that the filing of the instant HRI infringement suit placed it in a dilemma since if the suit was successful it would be forced to take licenses under HRI's domestic patents, thereby losing a defense to any pool claim of infringement of patent counterparts in Canada, and that accordingly it had to curtail its operations there pending the outcome of the infringement suit. The court in *Dairy Foods*, was speaking of the dilemma raised by the plaintiff's allegations which it had the burden of proving. In this case Zenith failed to prove what it alleged. As we have stated, the evidence reveals no curtailment of Canadian operations but instead indicates extensive sales in Canada as well as heavy expenditures for advertising there. Even if we assumed the continuation of an unlawful conspiracy after the 1957 settlement, into the damage period, the assumption is of no help to Zenith, under Highland Supply Corp. v. Reynolds Metals Co., 8 Cir., 327 F.2d 725, 732, absent proof of the *fact* of damage. Nor does the statement in Albert Pick-Barth Co. v. Mitchell Woodbury Corp., 1 Cir., 57 F.2d 96, 99, that the *fact* of damage need not be direct suppression of trade aid Zenith. The general language of Justice Holmes in United States v. Kissel, 218 U.S. 601, 607–608, 31 S.Ct. 124, 54 L.Ed. 1168, about a continuing criminal conspiracy, does not help Zenith since even if the continuous existence of the unlawful conspiracy was, as Zenith claims, a continuous overt act, the *fact* of damage must still be shown. The facts in this case do not resemble those in Continental Ore v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777, where there was clear evidence of defendant's refusal to deal with the Continental Company, as a result of which it had to drop out of the vanadium business.

We do not agree with Zenith that a Hazeltine attorney admitted at the trial that the existence of the conspiracy was a continuous overt act causing damage to Zenith. The admission was that "if the conspiracy continued" after 1957 there "might have been damage." Neither do we take as an admission to prove the *fact* of damage general statements of a Hazeltine attorney and letters long before the damage period to the effect that in "foreign countries" threats of adversely held patents are "as much of a risk to your business as are tariff restrictions, freight rates, insurance, and the many other impedimenta to the flow of trade."

In addition to oral testimony Zenith relies upon the 1957 settlement of Zenith's counterclaim in RCA v. Rauland Corp., 21 F.R.D. 113 (N.D.Ill.), to prove the fact of damage. However, under a well settled rule, e. g., Domarek v. Bates Motor Co., Inc., 7 Cir., 93 F.2d 522, 526, the settlement of Zenith's suit against RCA, General Electric and Western Electric constitutes no admission of the fact of damage against Hazeltine. Even if it is true that there were damages prior to the 1957 settlement this does not prove the fact of damage between 1957 and 1963. The 1957 settlement has relevance only so far as the release of future damages given by Zenith in that settlement precludes recovery for damages resulting solely from illegal activities of the Canadian pool prior to September 27, 1957, the date of the settlement.

Zenith relies too upon a "stipulation" of Hazeltine's attorney as to the *fact* of damage to Zenith's business. The attorney stated during testimony of a Zenith official, "I am perfectly willing

to stipulate that Zenith has had problems in exporting their radio and television receivers to Canada." We do not read that statement as a concession of the *fact* of damage. In context, the attorney's statement either referred to the period preceding 1957 and not to the pertinent damage period, or to other obstacles to export by Zenith such as tariffs, shipping costs, low priced competition, and technical problems.

For the reasons given, the judgment for Zenith for $34,811,631 upon the treble damage counterclaim is reversed.

### The Injunction

In addition to granting treble damages to Zenith, the district court ordered injunctive relief against HRI's conduct vis-a-vis Zenith in the use of HRI's domestic patents and against its participation in unlawful antitrust conspiratorial conduct.

 It follows from our conclusion with respect to the foreign patent pools that injunctive relief against "threatened loss or damage" directed at those pools, alleged by Zenith to be unlawful conspiracies, cannot be justified under 15 U.S.C. Sec. 26. Paragraph C of the injunction granted must be stricken.

 We agree with HRI that the district court erred in holding the method of computing royalties to be patent misuse. Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950). Therefore there is no basis for that part of the court's injunction relating to payment of royalties on unpatented products, and we order that it be modified by deleting from paragraph A the words: "or upon the paying of royalties on the manufacture, use or sale of apparatus not covered by such patent."

 We also agree with HRI that paragraph B of the injunction does not comply with the requirement of FED.R. CIV.P. 65 that it describe the acts restrained in reasonable detail. We order that it be modified so as to (1) give Zenith the benefit only of the same royalty rates as those presently in effect with other licensees, (2) permit licensing of

individual patents at rates the sum of which is greater than the package rate so long as the rates for individual patents are not so disproportionate to the package rate as to amount to economic coercion to force the taking of the package, and (3) not to require that comparable royalty rates be given to Zenith for longer periods than they are available to others.

### Conclusion

For the reasons given, the judgment against Hazeltine Corporation is vacated; the district court judgment holding the patent in suit invalid is affirmed; the award in favor of Zenith for treble $50,000, is affirmed; the awards for treble damages based on HRI's alleged participation in the foreign patent pool are reversed; and the cause is remanded to the district court for the sole purpose of entering judgment in favor of Zenith and against Hazeltine Research, Inc., in the amount of $150,000, striking paragraph C of the injunction, and modifying paragraphs A and B of the injunction in a manner consistent with the view expressed herein.

Reversed and remanded with directions.