**REX CHAINBELT INC., Plaintiff-Appellant (Cross-Appellee),**

v.

**HARCO PRODUCTS, INC., dba DFC Company, Defendant-Appellee (Cross-Appellant).**

Nos. 73–2139, 73–2059.

United States Court of Appeals, Ninth Circuit.

Feb. 6, 1975.

As Amended March 31, 1975.

**995**

Alfred H. Plyer, Jr. (argued), Chicago, Ill., for plaintiff-appellant.

Joseph Mueth (argued), Los Angeles, Cal., for defendant-appellee.

OPINION

Before VAN OOSTERHOUT,* BARNES and HUFSTEDLER, Circuit Judges.

BARNES, Circuit Judge:

This action was instituted by appellant Rex Chainbelt Inc. in the Federal District Court for the Central District of California against Harco Products, Inc. for infringement of Rex's U. S. Patent No. 2,970,783. Harco answered the complaint alleging that the patent was unenforceable because of misuse, and that the patent was void as being "obvious" under 35 U.S.C. § 103. Harco also filed a cross-complaint alleging that Rex's misuse of its patent and the bringing of this patent infringement suit constituted a violation of § 1 of the Sherman Act in that the patented process was being used to "tie" the sales of an unpatented component used in the process.

The district court found that it had jurisdiction over this contest under both the patent law (28 U.S.C. § 1338) and the antitrust law (28 U.S.C. § 1337).

After a trial on the merits, the court found: (1) the patent in question was void for obviousness under 35 U.S.C. § 103; (2) if the patent *were* valid, then while Harco had not directly (35 U.S.C. § 271(a)) or contributorily (35 U.S.C. § 271(c)) infringed the patent, they had actively induced others to infringe on the patent (35 U.S.C. § 271(b)); (3) Rex's sales of an unpatented staple commodity (epoxy resin) accompanied by an implied (can label) license to practice the patent constituted a *non de minimis* tying arrangement in violation of § 1 of the Sherman Act; (4) that Rex's tying arrangement also constituted a misuse of its patent (making the patent unenforceable) which misuse was not absolved because Rex had for royalties licensed other manufacturers of epoxy resin to issue "can label" licenses to practice the patent in question; and (5) that Harco has shown no damages to it as a consequence of Rex's antitrust violation, and was not entitled to attorney's fees, although costs were awarded.

Both Rex and Harco appeal to this court.

* Honorable Martin D. Van Oosterhout, Senior Circuit Judge of the Eighth Circuit, sitting by designation.

Rex appeals from the decision of the court below holding: 1) that the patent is void for obviousness, and 2) that Rex's "can label" licensing program constituted an antitrust violation or a misuse of its patent.

Harco appeals the decision of the district court holding that they were not entitled under the antitrust laws to treble the amount of the attorney's fees which they had expended in defending against the patent infringement suit.

## I. Validity of Patent

To provide a background with which to view the arguments as to the validity of the patent, we quote from Rex's Statement of Facts, which is, as quoted, essentially a conversational version of the facts agreed upon in the Pre-Trial Order (C.T. 1005–1031).

"The patent in suit is concerned with the art of gyratory crushers which are used in the mining and aggregate industry to crush rock, aggregate, minerals, etc. Rex's predecessor, Nordberg Manufacturing Company, has long been one of the major manufacturers of cone crushers in the United States and throughout the world. . . ."

"A conventional cone crusher is shown in Figure 5 of the '783 patent, plaintiff's exhibit 1 (hereinafter PX . . .) with material being fed in the top and passing through a crushing cavity that flares outwardly and downwardly. The crushing cavity is defined by an overhanging bowl which opposes a generally conical head. The head itself is mounted for gyratory movement within the bowl so that, as the material being crushed passes through the crushing zone, it is subject to a series of nips or impacts causing it to break and fracture before dropping through the bottom of the machine (CR 1007, Fact 6).

Crushing takes place between the bowl and head and each is provided with a removable wear-taking liner, the upper liner, which is on the bowl, being referred to as the bowl liner, and the lower liner, which is on the head, being referred to as the mantle. The bowl liner and mantle for many years have been made of manganese steel which is a tough metal with high wear-resistant properties. The liner and mantle are often referred to in the trade as "manganese." When either the bowl liner or mantle or both are worn out, they are removed and replaced with new ones (CR 1007, Fact 7). The bowl liner is held in place by lugs or hooks which project through openings in the bowl while the mantle is held down on the head by a locking sleeve and lock nut (PX 1).

Since crushing impacts are being delivered to the bowl liner and mantle under tremendous force, it is important that these wearing parts be solidly supported in the machine and fully backed in solid contact with the bowl and head so that the crushing impacts will not cause differential stresses between a fully backed area and an unsupported adjacent area in one of the wearing parts. Manganese steel is very difficult and expensive to machine or grind so the practice has been to reduce the amount of contact area to a bare minimum at the bottom, Reporter's Transcript 313, 314 (hereinafter RT . . .). For years it has been customary to provide a thin cavity or space above the contact area between the back of the liner and mantle and their supporting part, the bowl and head (CR 1008, Fact 9). Molten zinc has been poured into this thin space and allowed to solidify, hoping to obtain a full solid backing of the wearing part. Thus the practice has been for over half a century (CR 1008, Fact 10).

Zincing (as the procedure was called) has, in the best of circumstances, been unsatisfactory and in the worst, disastrous. Molten zinc has a number of very serious disadvantages:

1. It is extremely difficult to handle and pour liquid zinc. Very expensive protective clothing must be worn by the personnel, and serious burns

have resulted from spilling and accidents (RT 102, 103, PX 3a–h).

2. The equipment to melt, handle and pour molten zinc is very expensive. . . . (RT 104, PX 3a–h).

3. The zinc shrinks substantially as it solidifies. Even though the space behind the mantle or liner may be full of molten zinc, when it solidifies or freezes, voids will occur due to shrinkage. Striations and unsupported fissures will appear and differential stresses will be caused in the manganese during crushing, resulting in early failure of the wearing parts. (RT 105).

4. The continual pounding from the crushing action and the stretching and twisting of the manganese quite often will cause zinc to powder or granulate early in the life of a mantle or liner, referred to in the trade as "powdering out," which results in very little, if any, backing during use of the part which inevitably leads to its early failure (RT 105).

5. The problem of molten zinc has long existed in the industry . . . (CR 1018, Fact 72).

With the invention of the '783 patent, all of the disadvantages of zinc have been overcome and no new difficulties have been encountered. This patentee was the first to suggest the use of an epoxy formulation with very little, if any, solidification shrinkage as the backing for crushing wearing parts. It doesn't powder out. . . It has now become standard in the industry practically completely replacing zinc, with other major crusher and parts manufacturers taking licenses, . . .. The patented subject matter is in use in every mining country in the world (CR 1011, Fact 33) and the old zincing procedure is quite limited in the mining industry and practically non-existent in the aggregate industry (CR 1014, Fact 44).

Claims 1–6 of the patent cover a two-element combination, namely a manganese steel wearing part and a backing portion made of an epoxy resin formulation with certain physical characteristics. Claim 7 covers a three-element combination, the above two plus the crusher." (Rex's Opening Brief at 4–6.)

35 U.S.C. § 103, under which the district court held Rex's patent invalid reads:

"§ 103. Conditions for patentability; non-obvious subject matter

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. July 19, 1952, c. 950, § 1, 66 Stat. 798."

In the leading case of Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court interpreted § 103 so that a decision of obviousness is to be based on a three step analysis.

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." (Id. at 17–18, 86 S.Ct. at 694.)

We have little difficulty in determining the first two elements in this test. We have heretofore outlined the most important facts concerning element one, the state of the prior art. We now look

to the second element, the difference between the prior art and Rex's patent.

The crusher structure of the Cheyette (Rex's) Patent is old and well known as can be seen by a comparison with the Gruender Patent (No. 2,223,956) which was issued in 1940. Indeed, the only difference between the two patents is the substitution of an epoxy backing material for the prior zinc one. (C.T. 1017 # 65, C.T. 1090 # 9.)

At the time of the invention of the process (use of epoxy backing instead of zinc) upon which the Cheyette Patent was based, the properties of epoxy resins were well known. (C.T. 1090–91 # 10); including its ability to impregnate and fill voids, to cure at low temperatures, to resist impact and mechanical shock, its low shrinkage, and its extensibility with fillers. (C.T. 1091 # 13.) It should be noted that Rex did not invent a special type of epoxy resin with special properties for use in the process. Nordbak (Rex's commercial name for its epoxy resin formulation for use as a crusher backing) is an unpatented combination of epoxy resin "extended" by several inert "fillers." (C.T. 1093–94 # # 33, 36, 37.) The Cheyette Patent does not call for a specific formulation of epoxy resin, although it does mention that certain fillers *may* be used to obtain a variety of results. What the Cheyette Patent does call for is epoxy resin "having a high dimensional stability and a modulus of elasticity on the order of 1–3% of that of steel and a compression strength on the order of from 8–10 thousand psi." (C.T. 1090 # 6.) Epoxy resin of such specifications were well known prior to the Cheyette Patent. (C.T. 1090–91 # 10.)

▮ Viewed in light of the prior art, we must determine whether the substitution of one backing material for another is patentable, or alternatively, whether it was obvious "to a person having ordinary skill in the art." (35 U.S.C. § 103) (Element three of the *Graham* test).

As the Court notes in the *Graham* case, *supra,* at 17, 86 S.Ct. 684, the requirement of nonobviousness as expressed in 35 U.S.C. § 103 is but a codification of the leading case on the patentability of substituted materials: Hotchkiss v. Greenwood, 11 How. (52 U.S.) 248, 13 L.Ed. 683 (1850).

In *Hotchkiss* the issue was whether the substitution of clay or porcelain for wood or metal as the bulbous part of a doorknob was a patentable invention. The court held:

"[I]n the case before us, the knob is not new, nor the metallic shank and spindle, nor the dovetail form of the cavity in the knob, nor the means by which the metallic shank is securely fastened therein. All these were well known, and in common use; and the only thing new is the substitution of a knob of a different material from that heretofore used in connection with this arrangement.

Now it may very well be, that, by connecting the clay or porcelain knob with the metallic shank in this well-known mode, an article is produced better and cheaper than in the case of the metallic or wood knob; but this does not result from any new mechanical device or contrivance, but from the fact, that the material of which the knob is composed happens to be better adapted to the purpose for which it is made. The improvement consists in the superiority of the material, and which is not new, over that previously employed in making the knob.

But this, of itself, can never be the subject of a patent. No one will pretend that a machine, made, in whole or in part, of materials better adapted to the purpose for which it is used then the materials of which the old one is constructed, and for that reason better and cheaper, can be distinguished from the old one; or, in the sense of the patent law, can entitle the manufacturer to a patent.

The difference is formal and destitute of ingenuity or invention.

\* \* \* \* \* \*

In other words, the improvement is the work of the skilful mechanic, not

that of the inventor." (*Id.* at 265–67, 13 L.Ed. 683.)

We feel that *Hotchkiss* is controlling of the factual situation present in this case. *See* in addition, our decision in Griffith Rubber Mills v. Hoffar, 313 F.2d 1 (9th Cir. 1963).

Rex's principal arguments seeking to distinguish *Hotchkiss* and its progeny from the instant case are: 1) Rex's allegation that the discovery that epoxy resin wouldn't "powder out" was an unusual, surprising and unexpected result, citing: Hewlett-Packard Co. v. Tel-Design, Inc., 460 F.2d 625 (9th Cir. 1972); and Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162 (1950); and 2) that Rex's process (in the language of the *Graham* case) filled a "long felt but unresolved need" in the industry, and was "commercially successful."

Concerning the first argument, Rex assures us that it was truly astounded when it learned that epoxy resin wouldn't "powder out" when used as a backing material in crushers. In their brief Rex amplifies on this point:

"The 'synergistic result' here required by Edoco Products, Inc. v. Peter Kiewit Sons' Co., 177 USPQ 418 (9th Cir. 1973) is that an epoxy formulation backing will not 'powder out', a result totally surprising and completely unanticipated. Harco (DB 45) dismisses this as merely the known impact resistance of epoxy resin. But none of Harco's evidence, and specifically the exhibits Harco refers to, teaches that epoxies are known not to granulate or powder and there is no evidence that impact resistance has any relationship to granulation or, as we have termed it, 'powdering out.' Impact resistance means a material won't break when struck. Powdering or granulation .goes beyond that. There is a clear difference between breaking on the one hand, and disintegration, on the other. Lots of materials break without disintegrating." (Rex's Reply Brief at 2–3.)

We find Rex's argument specious. It is true that a material which breaks may not disintegrate, but the converse of that statement, and the question before us, seems hardly true. Given the known impact resistance of epoxy resin, which the court finds and both parties admit, it certainly was within the ordinary skill of the art, that from a knowledge that a material had a high impact resistance one would postulate that it also would be a very likely candidate not to "powder out."

The very cases which Rex cites in support of their first argument weighs against them on the facts of this case. The *A & P* case *supra,* the leading statement on the law of combination patents states:

"The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics. This case is wanting in any unusual or surprising consequences from the unification of the elements here concerned, . . ..

Neither court below has made any finding that old elements which made up this device perform any additional or different function in the combination than they perform out of it.

\* \* \* \* \* \*

Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented

**1000**

here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of the prior art and claims them in congregation as a monopoly." (340 U.S. at 152–53, 71 S.Ct. at 130.)

■ As to Rex's second argument, apart from the fact that we could readily dispose of it on the basis of the contrary finding of fact by the trial court (C.T. 1092 # 24), we note that even if we assume that the epoxy backing did fill a long felt need for crushers users, this is only an indication, and not a *prima facie* demonstration, of invention. As the Supreme Court said in Anderson's-Black Rock v. Pavement Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969):

"A combination of elements may result in an effect greater than the sum of the several effects taken separately. No such synergistic result is argued here. It is, however, fervently argued that the combination filled a long felt want and has enjoyed commercial success. But those matters 'without invention will not make patentability.' Great A. & P. Tea Co. v. Supermarket Corp., 340 U.S. 147, 153 [71 S.Ct. 127, 130, 95 L.Ed. 162]." (*Id.* at 61, 90 S.Ct. at 308.)

Likewise, Rex's reliance upon our decision in Reeves Instrument Corp. v. Beckman Instruments, Inc., 444 F.2d 263 (9th Cir. 1971), cert. denied 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971), is misplaced. Looking at the Cheyette crusher as a whole (*Cf.* Radiator Specialty Co. v. Micek, 327 F.2d 554 (9th Cir. 1964), cert. denied 379 U.S. 821, 85 S.Ct. 41, 13 L.Ed.2d 31 (1964)), we see an improved product but not an innovatively different one. Looking at the problem of finding a suitable means for handling the internal stresses in crushers, in substituting epoxy for zinc we see the development and refinement of an old concept (*i. e.* a backing material) but not an inventive or new approach to the problem.

In sum, the record discloses ample evidence to support the district court's finding that Rex's patent was void for obviousness under 35 U.S.C. § 103.

## II. *The Antitrust Violation and Patent Misuse Claims*

■ We next review the district court's determination that Rex's label licensing program constituted a tying arrangement, *per se* violative of § 1 of the Sherman Act, and consequently, a misuse of its patent. (*Cf.* Ansul Co. v. Uniroyal, Inc., 448 F.2d 872, 879–81 (2d Cir. 1971), cert. denied 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972).)

We agree with the court below that it did.

The findings of the court below relevant to this portion of the appeal are quoted in the margin.[1]

---

1. (C.T. 1094–98)

(Findings as numbered)

"34. Epoxy resin with additives of the type involved in this case, as exemplified in "Rockfill" and "Nordbak" is a staple article of commerce having substantial non-infringing uses.

\* \* \* \* \* \*

38. Plaintiff-counterdefendant sells, and since at least April 28, 1960, has sold "Nordbak" epoxy resin to crusher users with directions for using the same in the practice of United States Letters Patent No. 2,970,783, and an implied license under said patent has accompanied the sale of every can of "Nordbak." "Nordbak" is sold with the instructions and directions as shown by Plaintiff's

can labels and brochures for using the backing material in the practice of the alleged invention claimed in United States Letters Patent No. 2,970,783. Plaintiff does not identify or otherwise specify any portion of the sales price of the epoxy sold under the name "Nordbak" as being a royalty and it does not demand payment of royalties from purchasers of backing material sold under the name "Nordbak" or otherwise require an accounting to it for the practice of the alleged invention covered by said patent.

39. Plaintiff-counterdefendant has brought actions for infringement of Patent No. 2,970,783 against each supplier of epoxy resin products competing with "Nordbak," which actions have resulted either in a settlement and

Rex sells its unpatented epoxy crusher backing material (Nordbak) with a "can label" license authorizing the purchaser thereof to use the contents in the practice of Rex's Cheyette Patent No. 2,970,-783. Rex has never issued a direct license (i. e. one apart from the can label

a license to the competitor, or the competitor's stopping competitive sales.

40. Each of the Plaintiff's licensees sells epoxy resin to crusher users under circumstances which imply a license under Patent No. 2,970,783 with every can of epoxy resin sold.

41. Defendant began selling its epoxy resin under the name "Rockfill" in 1970 and since that time Plaintiff and Defendant have been direct competitors in the sale of epoxy resin to crusher users.

42. Prior to the filing of the present action, Defendant requested a license under Patent No. 2,970,783 from Plaintiff. Plaintiff did not offer Defendant a license under Patent No. 2,970,783 until after the filing of Defendant's antitrust counterclaim herein, and then offered a license at a royalty rate four times greater than the royalty rate provided in the Plaintiff's other licenses.

43. The sales of "Nordbak" with said implied license to practice Patent No. 2,970,783 constitute tying contracts between Plaintiff and crusher users buying "Nordbak" from it.

44. The tying item is the right to practice Patent No. 2,970,783 which accompanies each, can of "Nordbak." The requisite economic power in the tying item is provided by the purported Patent No. 2,970,783.

45. The tied item is epoxy resin, and the relevant market and line of commerce herein affected is the national market in epoxy resin.

46. The sales of "Nordbak" epoxy resin to crusher users in the above-described manner have been substantial, exceeding Five Hundred Fifty Thousand ($550,000) Dollars in 1971.

47. The effect of Plaintiff-counterdefendant's tie-in sales of "Nordbak" with an implied license and its infringement actions has been to restrain trade and to substantially lessen competition in the sale of epoxy resin to crusher users in violation of Section 1 of the Sherman Act, Section 1, Title 15, United States Code.

48. Defendant is entitled to an injunction against the continuation of said antitrust violation pending the within adjudication of the invalidity of the patent in suit becoming final. When the said finding of invalidity becomes final, no further injunction will be required. If Patent No. 2,970,783 is later found to be valid, Defendant shall be entitled to a permanent injunction.

49. Plaintiff by its use of Patent No. 2,970,783, as set forth in Findings 31–47, has

license) to a crusher user to practice the patent, and Rex has no company policy in connection with the issuance of such licenses. (C.T. 1017 # 62.)[2]

Given the fact that the label license is the only apparent way that a crusher misused said patent, rendering the patent unenforceable."

2. Rex is correct in its contention that the fact that no one has yet asked them for a direct license (and consequently no one was refused one) is evidence that there is no economic tying effect or misuse present. Federal Sign & Signal Corp. v. Bangor Punta Op. Inc., 357 F.Supp. 1222 at 1240 (S.D.N.Y.1973); Ansul Co. v. Uniroyal Inc., 306 F.Supp. 541, 562–63 (S.D.N.Y.1969), 448 F.2d 872 (2d Cir. 1971), cert. denied 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972); however, it is not conclusive of the point. It is merely one factor to be considered by the district court. E. g.:

"At the oral argument it seemed to me that the method of business adopted by the plaintiff in the case at bar could not be considered objectionable in the absence of a finding that the plaintiff had refused or would refuse to grant an unrestricted license to any shoe manufacturer who chose to buy from some other source the materials used in reinforcing the insoles by the patented process. That is, if the plaintiff is prepared to grant an unrestricted license on a royalty basis to any shoe manufacturers who prefer to obtain the unpatented precoated duck and top coat elsewhere, it is difficult at first blush to see how the plaintiff would be doing anything wrong in furnishing the unpatented materials and incidental services at so much per web yard of duck to those shoe manufacturers who prefer to do business with the plaintiff on that basis. But this point was urged in Leitch Mfg. Co. v. Barber Co., supra, and it was pointed out in the plaintiff's brief before the Supreme Court that the plaintiff was 'not shown to have refused to grant any license under the patent, much less granted any license conditioned on purchase of emulsion from it.' The argument was to no avail. The court considered it sufficient to condemn the plaintiff's method of doing business, that, as matters stood, no road contractor had a license to practice the patented process except those contractors who bought their bituminous emulsion from the plaintiff."

B. B. Chemical Co. v. Ellis, 117 F.2d 829 at 838 (1st Cir. 1941) (Magruder, C. J., concurring), aff'd 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367 (1942).

user can obtain a license to exercise the Cheyette process, and because no other licensing program for the patent was visibly available, we have little difficulty in holding that there was sufficient evidence from which the trial judge could conclude that a tying agreement was implicit in the label license. (C.T. 1094–95 # 40) and that such an arrangement constituted a misuse of the patent. *See* Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371 (1938); B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367 (1942).

This court in Stearns v. Tinker & Rasor, 252 F.2d 589 (9th Cir. 1957), cert. denied 350 U.S. 830, 76 S.Ct. 62, 100 L.Ed. 741 (1955), long ago noted in the patent misuse context:

> "The mere fact that an owner of a patented article combines the article with an unpatented article and sells or leases the unit as a whole does not *per se* prove misuse. The holder of a patent can exploit his legally protected monopoly in the patent as best he sees fit, so long as in doing so he does not restrain competition in the unpatented article. Probably the best way for an owner of such a patent to protect himself from a charge of misuse would be to offer or stand ready to offer the patented item alone.[13]"

Footnote 13. "If 35 U.S.C.A. § 271 is applicable, perhaps the owner need not even offer or stand ready to sell the unpatented article. This would be where the unpatented part is a non-staple material part of the invention, which is not capable of substantial non-infringing uses." (*Id.* 252 F.2d at 604.)

A patentee, such as appellant, who does not affirmatively offer, or express a willingness to offer, a licensing program separate from the label license attached to a staple article of commerce,[3] runs the risk that the court may, in conjunction with the particularized evidence in the case, conclude that a tying arrangement is implicit, and that a misuse of the patent has occurred.[3a] Our holding is certainly not intended to rule out or otherwise affect the certain narrow "packaging" "component" or "total product" justifications previously enunciated by the courts for certain marketing techniques which may appear to have the technical appearance of a tying arrangement without the economic coercion. *See, e. g.*, United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D.Penn. 1960), aff'd 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961). We merely indicate that any patentee who sells the patented item only in conjunction with some other

**3.** There is ample evidence in the record to support the district court's finding that "Nordbak" was a staple commodity. It is well settled that the mere addition of extenders to a staple article does not make the article nonstaple. Dr. Salsbury's Laboratories v. I. D. Russell Co., 212 F.2d 414 (8th Cir. 1954), cert. denied 348 U.S. 837, 75 S.Ct. 50, 99 L.Ed. 660 (1954). There the court held that the addition of other dilutive ingredients to a staple article of commerce does not cause the article "to lose its characteristics as a common raw material." (212 F.2d p. 416) This is particularly true here since the extenders are not "components" of the invention. The epoxy resin present in "Nordbak" is the only component of the patent at issue and that is a staple article of commerce.

**3a.** In oral argument counsel for Rex argued that crusher users have an alternative to the can label license in that users can purchase a new crusher from Rex. In view of the fact that the backing material in a crusher will wear out many times during the life of a crusher, we hardly think that being required to purchase an expensive new machine when the backing wears out is a viable alternative to the can label license. A great economic disparity in alternatives will just as effectively create or enforce a tie as the absence of choice. Rex argues that if it wanted to, under the patent laws, it could sell the crusher alone, and not grant can label licenses. This may well be so, but Rex has not chosen to follow this course. A patentee has a privilege to exploit its patent, but this privilege does not encompass tying. Tying is disapproved because of its anticompetitive effects upon the market of the tied product. If Rex had chosen to sell crushers alone, an affect on a tied market would be absent; but as it stands now, the can label licensing program adopted by Rex, by effectively and practically foreclosing and limiting the sources to which crusher users may look to purchase staple epoxy resin, has substantially burdened competition in the market of that tied product.

unpatented staple good raises serious suspicions of tying behavior and misuse. The users of such marketing programs bear a heavy burden in overcoming this suspicion and in bringing themselves within one of the aforementioned justifications. Additionally we note, that as in the instant case, where there has been a factual determination by the trial court that such an arrangement is indeed coercive tying, that determination will not be easily reviewable, nor likely to be reversed, in this court.

The record discloses that Rex has had a consistent program of bringing patent infringement suits against all other sellers of epoxy resin to be used as backing material for crushers. In doing so Rex has effectively dried up any source of supply which a crusher user might look to, except for Rex and its licensees.[4] (C.T. 1094 # 39.)

Admittedly, Rex has acted attendant to a bona fide belief that it was done in protection of their patent, but the effect upon the tied market has been to restrain commerce in epoxy resins nonetheless. Tying is still a *per se* violation of § 1.

In short, Rex has exercised the market power attendant to its rights under the Cheyette patent (the tying product) in the epoxy resin market (the tied product). Such power is significant and the amount of commerce affected is not *de minimis.*

The facts in this case are controlled as to its antitrust aspects by International Salt Co., Inc. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); and as to the patent misuse claim by Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371 (1938).

The district court did not err in holding that Rex's can label licensing program violated § 1 of the Sherman Act, and constituted a misuse of its patent.

### III. *Attorney's Fees*

We turn now to Harco's appeal from the district court's holding that Harco could not recover as part of treble damages under the antitrust laws, the attorney's fees which it incurred in defending against the patent infringement action brought by Rex.

The holdings of the court below, as stated in its findings of facts and conclusions of law (C.T. 1089–98), which are relevant to our consideration of this issue, are quoted in the margin.[5]

---

4. Rex's licensees are producers of epoxy resin whom Rex has in the past sued for contributory infringement and with whom it has settled. This is further evidence of the effect upon the tied market. Rex has in effect achieved the result that it is licensing its licensees to produce epoxy resin for use in its patent process. That is, part of the royalties are derived not from the right to practice the patent, but rather from the right to sell unpatented epoxy resin (the tied product).

5. (C.T. 1092, 1096–98)
 (Findings as numbered)
 "27. Assuming the patent were valid, then Defendant has, by its bulletin for epoxy resin sold under the name "Rockfill," and its can labels actively induced Livingston-Graham Inc., a purchaser of said epoxy resin from Defendant, to directly infringe U. S. Patent No. 2,970,783. Defendant has actively induced infringement under Section 271(b), Title 35, United States Code.
 * * * * * *
 50. Defendant has failed to meet its burden of proof that it has been damaged by plaintiff's antitrust violation. There is no credible evidence that defendant has been damaged by plaintiff's conduct up to this time. There is no credible evidence that defendant has lost any customer or failed to gain any other customer that it could have reasonably expected to gain, because of any act of plaintiff. There is no evidence that plaintiff has sued or even threatened to sue any customer or potential customer of defendant.
 51. This is neither an extraordinary nor an exceptional case, and defendant is not entitled to recover its attorney's fees under either the antitrust or patent aspects of the case. Plaintiff has not been guilty of bad faith or inequitable or unconscionable conduct in the prosecution of the action.
 52. Defendant is entitled to recover its costs.
 * * * * * *
 From the foregoing facts the Court concludes:
 [Conclusions as numbered]
 * * * * * *

Harco was unable in the court below to produce any credible evidence that it was damaged by Rex's antitrust violation (tying). Indeed, Harco concedes this point on appeal (Harco's Brief at 4). However, Harco urges that the bringing of the infringement action by Rex is *per se* an action in furtherance of the tying situation and hence under 15 U.S.C. § 15 there would exist damages (*i. e.* the cost of defending against the patent infringement suit) for which Harco should be allowed to recover threefold the amount. In support of this proposition Harco cites: Kobe v. Dempsey Pump Co., 198 F.2d 416, 424–25 (10th Cir. 1952), cert. denied 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651 (1952); Hazeltine Research, Inc. v. Zenith Radio Corp., 388 F.2d 25, 35 (7th Cir. 1967), aff'd in part, rev'd in part, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); Clapper v. Original Tractor Cab Co., 270 F.2d 616, 623–24 (7th Cir. 1959), cert. denied 361 U.S. 967, 80 S.Ct. 588, 4 L.Ed.2d 547 (1960); Switzer Brothers Inc. v. Locklin, 297 F.2d 39 (7th Cir. 1961), cert. denied 369 U.S. 851, 82 S.Ct. 934, 8 L.Ed.2d 9 (1962); and to which list we add: Dairy Foods, Inc. v. Dairy Maid Products Coop., 297 F.2d 805 (7th Cir. 1961); which case succinctly declares:

"Where an infringement suit is brought as part of and in furtherance of a combination and conspiracy which violates the antitrust laws and results in injury such as is here alleged the person injured may recover threefold the damages he sustains. Clapper v. Original Tractor Cab Company, 7 Cir., 270 F.2d 616; Kobe, Inc. v. Dempsey Pump Co., 10 Cir., 198 F.2d 416, 424–425. And each of these cases is authority for the recovery of threefold the cost and expense of defending such an infringement suit." (*Id.* at 809.)

We agree with the holdings in the above cases, but feel that Harco's reliance upon them to create a *per se* right to treble attorney's fees in all combination patent-infringement-antitrust actions is misfounded, and based on a misreading of the relevant precedents.

The Report of the Attorney General's National Committee to Study the Antitrust Laws (1955) at 247–48 analyses and balances the policy and issues on both sides, and properly states the law in this area. We quote therefrom:

"5. *Infringement Suits.*

The usual means of enforcing patent rights is by direct infringement suit. One or numerous infringement suits, by themselves, constitute no antitrust violation. Infringement suits may, on the other hand, play a part in an overall plan to unduly restrain or monopolize commerce. Threats of suit under a group of narrow and weak patents may be potent to harass and deter competition.

In Kobe v. Dempsey the court found a plan of monopolization of the rodless pump industry by buying up all the present and future patents in the field and obtaining covenants from the sellers not to compete. The infringement suit against Dempsey, the court noted, was a part of the plan to eliminate Dempsey as a competitor. Moreover, the court found a persistent effort to eliminate Dempsey by a customer boycott in connection with the suit. Treble damages were awarded to Dempsey on the ground that the court should not be a 'vehicle for maintaining and carrying out an unlawful monopoly.' To deny recovery, the court said, 'would permit a monopolizer to smother every potential competitor with litigation' and 'leave the competitor without a remedy.'

7. If the patent is valid, Defendant has actively induced infringement of the patent by crusher users, Section 271(b), Title 35, United States Code.

\* \* \* \* \* \*

14. Defendant has failed to prove that it has been damaged by the antitrust violations

and no damages are awarded, Richfield Oil Company v. Karseal, 271 F.2d 709 (CA9 1959).

15. This is not an exceptional case, and no attorneys fees are awarded, Section 285, Title 35, United States Code."

More recently the same court distinguished the *Kobe* case in Cole v. Hughes Tool Co., 215 F.2d 924, where it reiterated that a good faith patent infringement suit, though the patent was held invalid, did not violate the antitrust laws. The court noted, that in contrast *Kobe* involved a situation where monopoly was obtained by patent purchases and the infringement suit itself was an integral part of the scheme of monopolization.

We concur with the *Kobe* decision when so regarded. For there is obvious merit in holding that where the evidence clearly established damages resulting from the infringement suit or it was brought in bad faith as part of an agreement or plan violative of the antitrust laws, treble damages should be awarded. However, we consider it equally important not to imperil free access to the courts for determination and protection of patent rights.

Accordingly we make the following recommendations:

a. Where it is shown that an infringement suit has, in fact, been brought as an integral part of an agreement or plan to violate the antitrust laws and that the defendant sustained resulting damages, treble damages for antitrust violation should be recoverable, whether or not there was a colorable claim of infringement." (*Id.* at 247–48.)

In those cases which have awarded as part of antitrust treble damages, attorney's fees incurred in defending patent infringement actions, we see the consistent thread of the patent infringement suit being used with ulterior motives as a predatory means—an aggressive weapon to attain some other anticompetitive end—, as opposed to its being used as a defensive shield with which to protect the patent interests.

The language of the *Kobe* case, *supra,* is instructive as to this distinction:

"It is said that to allow recovery of damages resulting from the infringement action would be a denial of free access to the courts. We fully recognize that free and unrestricted access to the courts should not be denied or imperiled in any manner. At the same time we must not permit the courts to be a vehicle for maintaining and carrying out an unlawful monopoly which has for its purpose the elimination and prevention of competition. The trial court found that Kobe did not institute the infringement action in bad faith but believed that some of its patents were infringed, and that Kobe intended to secure a judgment which would eliminate defendants as competitors and to remain in exclusive possession of the whole of the interstate markets for deep well hydraulic pumps for oil wells. The trial court also found that the infringement action and incidental activities by Kobe were intended and designed to further the existing monopolistic purposes.

We have no doubt that if there was nothing more than the bringing of the infringement action, resulting damages could not be recovered, but that is not the case. The facts as hereinbefore detailed are sufficient to support a finding that although Kobe believed some of its patents were infringed, the real purpose of the infringement action and the incidental activities of Kobe's representatives was to further the existing monopoly and to eliminate Dempsey as a competitor. The infringement action and the related activities, of course, in themselves were not unlawful, and standing alone would not be sufficient to sustain a claim for damages which they may have caused, but when considered with the entire monopolistic scheme which preceded them we think, as the trial court did, that they may be considered as having been done to give effect to the unlawful scheme." (*Kobe, supra,* 198 F.2d at 424–25.)

The mere coincidence of an antitrust violation and a patent infringement suit is not sufficient to entitle Harco to attorney's fees expended in defense of the patent infringement claim absent

some showing from which the trial court can find, or infer, that the patent infringement suit was brought in furtherance and as an integral part of a plan to violate the antitrust laws. *See* La Salle Street Press, Inc. v. McCormick & Henderson, Inc., 445 F.2d 84 at 96 (7th Cir. 1971); American Infra-Red Radiant Co. v. Lambert Ind. Inc., 360 F.2d 977 at 996–97 (8th Cir. 1966), cert. denied 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144 (1966).

This distinction was recently applied by the Second Circuit in an able opinion by Judge Lumbard which held:

> "Plaintiff Ansul argues that it is entitled to recover treble for its expense incurred in defending Uniroyal's patent infringement suits against it and against the various distributors which it had agreed to indemnify. Ansul contends that these suits were part of Uniroyal's endeavors to perpetrate its unlawful market scheme, for, as the trial court found, 'these suits together with Uniroyal's other activities . . . had the effect of perpetuating the price and market stabilization achieved through its earlier violations of § 1 of the Sherman Act . . . .' 306 F.Supp. at 567. Hence, it argues, its expenses in defending those suits are properly recoverable under Hazeltine Research, Inc. v. Zenith Radio Corp., 388 F.2d 25, 35 (7th Cir. 1967), aff'd in part 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), where the court stated: 'Zenith's expenses in defending the infringement suit brought pursuant to HRI's antitrust violations are a proper subject of threefold recovery.'

Judge Mansfield, after making the statement quoted above as to the effect of these suits, then rejected Ansul's contention stating that

> 'even though the suits were one of many activities which collectively had the effect of inhibiting an effective purge of [Uniroyal's] earlier misconduct, they were instituted by it in good faith and for the purpose of resolving the issues of validity and infringement rather than with

the intent or purpose of restraining trade in violation of the Sherman Act. Thus Uniroyal's suits must be distinguished from those brought in furtherance of an antitrust conspiracy . . . .' 306 F.Supp. at 567.

Ansul argues that intent is not necessary to a Sherman Act § 1 violation and that whatever its actual intent may have been, Uniroyal as a proven antitrust violator is conclusively presumed to be responsible for the direct consequences of its acts. Hence, according to Ansul, even if the intent of Uniroyal's suits was legitimate, the fact that their effect was to further the unlawful conspiracy makes them part of that conspiracy and thus allows Ansul to recover treble its expenses in defending them.

> We agree with the result reached by the district court. A patentee who has reasonable grounds for believing that his patent is valid and that it is being infringed should not lightly be precluded from availing himself of the courts."

Ansul Co. v. Uniroyal Inc., 448 F.2d 872 at 882 (2d Cir. 1971), cert. denied, 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972).

The institution of a patent infringement suit when the patent also is the tying product is not necessarily or always an action brought in furtherance of the illegal tying situation. Mere co-existence of a tying situation and the patent infringement suit is not sufficient to demonstrate that the suit was brought in furtherance, or as an *integral* part of a *plan* to violate the antitrust laws. Tying is a *per se* violation of Section 1 of the Sherman Act. Purely negligent and unintentional acts can and do constitute violations of the antitrust laws if they have, or are presumed at law to have, the required anticompetitive economic effect. The focus of the antitrust laws is not upon the intentions of the actor, but rather upon the effect of the actions upon commerce. Hence, we can have the situation of a patentee who is unintentionally or negligently in violation of the antitrust laws 1) bringing an

infringement suit to protect his rights under a valid patent (or a patent he in good faith believes to be valid) and 2) believing in good faith that he is neither misusing his patent nor violating the antitrust laws. In cases such as the one just illustrated we cannot say that the patent infringement suit is brought in furtherance of an antitrust violation. Whether the case *sub judice* falls into this classification we cannot determine from the record on appeal. We therefore remand to the district court for a determination of whether Rex brought this infringement suit in furtherance of the antitrust violation.

 The court below held: "plaintiff has not been guilty of bad faith or inequitable or unconscionable conduct in the prosecution of this action." (C.T. 1096.) But, from this holding we cannot determine whether 1) Rex merely had a good faith belief in the validity of its patent, but was intentionally using its patent in furtherance of a tying scheme (*cf. Kobe, supra*); or 2) whether Rex not only in good faith believed that its patent was valid, but also believed that it was not misusing its patent or violating the antitrust laws. On remand, if the district court finds the former situation existed, damages should be awarded based on the basis of an antitrust violation. If the court below finds the latter, then they should not be awarded under the antitrust laws.

Harco is not entitled to recover reasonable attorney's fees under the patent laws (35 U.S.C. § 285). Indeed, Harco practically admits his point on appeal. Quoting from Harco's Reply Brief at p. 5:

> "[A]ttorney fees may be awarded to the prevailing party in 'exceptional' patent cases under 35 U.S.C. § 285. *Decisions by this court in patent cases have indicated that there must be a showing of palpable fraud, bad faith, unfair conduct by a party or its attorney, or some other consideration of similar force which makes it grossly unjust for the winning party to bear its attorney fees.* Dow Chemical v.

Dart Industries, Inc., 475 F.2d 124 (CA9 1973); Florida Brace Corp. v. Bartels, 332 F.2d 337 (CA9 1964); Park-in-Theatres, Inc. v. [Perkins] Parkins, 190 F.2d 137 (CA9 1951). *Such an award is primarily a matter for the exercise of district court discretion.* Bates Industries Inc. v. Daytona Sports Co., 441 F.2d 1110 (CA9); Ashcroft v. Papermate Mfg. Co., 434 F.2d 910 (CA9 1970)." (Emphasis added.)

In the instant case the district court explicitly found that this was not "an extraordinary or exceptional case" warranting an award of reasonable attorney's fees under the patent law. (C.T. 1096, 1098.)

 We hold that the district court did not err in construing the *patent laws* in denying Harco's prayer for attorney's fees.

This case is remanded to the district court for a determination of whether Harco is entitled to attorney's fees under the antitrust laws, in accordance with the tests set forth in this opinion. In all other respects, the decision of the district court is affirmed.